## SCOTT *vs.* DEPEYSTER and others.

Even though a loss accrues to the funds of an incorporated company, arising from error on the part of the directors, still, as between them and a stockholder, they will not, without other fault, be held liable.

No man who takes upon himself an office of trust or confidence for another or for the public, contracts for any thing more than a diligent attention to its concerns and a faithful discharge of the duty which it imposes. He is not supposed to have attained infallibility; and, therefore, does not stipulate that he is free from error.

If a corporate company engaged in unauthorized and illegal transactions, a stockholder, who had a knowledge of the same and acquiesced therein by participating in the results, shall not be allowed to charge the directors personally if there be a loss through such transactions.

Directors of a corporate company, in appointing a secretary, do not become sureties for his fidelity and good behaviour. If they select persons to fill subordinate situations who are known to them to be unworthy of trust or notoriously of bad character, and a loss, by fraud or embezzlement, ensues, in such a case, a personal liability rests upon them: but not otherwise.

Directors have a right to repose confidence in their secretary in every thing within the scope of his duties.

Directors are not to be held personally liable as between themselves and a stockholder, unless there has been negligence or fraud.

Persons who become directors or managers of a corporation, place themselves in the situation of trustees; and the relation of trustees and *cestuis que trust* is thereby created between them and the stockholders. The former are obliged to take the same care and use the same diligence as factors and agents. They are answerable not only for their own fraud and gross negligence, but also for all faults which are contrary to the care required of them.

Directors are to be looked upon as bailees of the property. And as they are persons generally having an interest in the stock, they are not bailees who are to derive no benefit from their undertaking and, therefore,

to be held responsible for slight neglect, but they act in relation to a bailment beneficial [to both parties. And the rule then is, they must answer for ordinary neglect; and "ordinary neglect" is understood to be, the omission of that care which every man of common prudence takes of his own concerns.

O. G. C., as secretary of an Insurance Company, embezzled its funds, to the amount of one hundred and seventy-seven thousand one hundred and sixty-six dollars and seventeen cents, within three years, by altering checks and keeping back money received to be deposited. He produced forged bank books whenever information was required; and he had written entries in the regular books as if he had actually made the deposits. Committees had been regularly appointed, and before whom he had, from time to time, passed his accounts. Neither his general course of private conduct nor his defalcations were known until he had committed suicide. And as it appeared that the general conduct and investigations of the directors were the same as pursued in other companies by prudent men careful of their own concerns: *it was held*, on a bill filed by a stockholder against the directors, that they were not personally liable on account of such fraud and embezzlement.

---

*December 6, 7, 8, 10.*
*1832.*

*Incorporated Company. Liability of directors to stockholders on account of embezzlement by the secretary.*

THE bill in this suit was filed by the complainant, on behalf of himself and all others stockholders of the National Insurance Company who should come in and contribute to the expenses of the suit, against Frederick Depeyster, Isaac Lawrence, Benjamin L. Swan, John Bolton, Jacob P. Giraud, Thomas Lawrence, Joseph Grinnell, Philip Hone, Richard Riker, William Whitlock, jr., James K. Hamilton, James Heard, David Hadden, Louis F. Varet, Cornelius W. Lawrence, Francis H. Nichol, Horace W. Bulkley, Hickson W. Field and James Lovett, for the purpose of charging them personally with heavy amounts embezzled by Oliver G. Kane as secretary of the said National Insurance Company and of which these parties had been directors.

The bill of the complainant set forth the creation of the "National Insurance Company" under an act of the legislature passed the fourteenth day of April one thousand eight hundred and fifteen; and that the number of shares in the stock of the company was limited to five thousand at one hun-

dred dollars each. That the stock, property, affairs and concerns were to be managed by nineteen directors, one of whom was to be president, and who were to hold their offices for one year and until others were chosen; and the president was to be sworn faithfully to discharge his office. That the stock was to be made assignable and transferable according to such rules as the president and directors should establish; and it was further provided, by the seventh section of the said act, that the president and directors should have power to make and prescribe such bye-laws, rules and regulations as to them should appear needful and proper touching the management and disposition of the stock, property, estate and effects of the said corporation and transfer of shares and touching the salaries, duties and conduct of the president, assistant, if any, secretary, officers, clerks and servants employed and touching the election of directors, and all such matters as appertain to the business of insurance. That the said corporation had power to make all kind of marine insurance upon lives by way of tontine or otherwise to lend money upon bottomry and respondentia. And the complainant also set forth, that by the ninth section of the said act, it was enacted, that it should be the duty of the president and directors on the first Mondays of January and July in every year to make a dividend of so much of the profits of the said corporation as to them or a majority of them should appear advisable; and in case of any losses whereby the capital stock should be lessened, no subsequent dividend should be made until a sum equal to such diminution arising from the profits of the corporation should have been added to the capital; and, by the eleventh section, it was enacted, that the said corporation should not, directly or indirectly, deal or trade in buying or selling any goods, wares or merchandize or commodities whatsoever, nor in buying or selling any stock created by any act of congress of the United States or of any particular state, unless in buying the same in order to invest its capital stock or any part thereof by way of securing the said capital stock or in selling the same for the payment of its debts or to invest in other

1832.

SCOTT
v.
DEPEYSTER.

stock or where truly pledged to it by way of security for debts due to the said corporation—and further, that it should not be lawful for the said corporation to issue or emit any notes or bills or make any contracts for the payment of money, only except the same were under its seal. And that, by the fourteenth section, it was further enacted, amongst other things, that before the said corporation assumed any risk, the amount of capital stock then already subscribed should be paid by the subscribers to the president and directors and by them securely invested either in any of the public stock funds or debt of the United States or of this state or in the stock of any of the incorporated banks in the city of New York or loaned to individuals upon their bond secured to be paid by mortgage upon unincumbered real estate within the State of New-York of the value of fifty per cent. more than the amount of the sum to be loaned; and if the said president and directors should, at any time, neglect so to do, they were to be held responsible in their individual and private capacities for any loss or losses which might be sustained by any person by reason of such negligence. That the capital stock having been securely invested, great gains were acquired by the company, so that in January one thousand eight hundred and seventeen they were enabled to declare and pay a dividend of fifteen per cent. out of the profits of its business of insurance for the period of six months. That, confiding in the character of the company and the proper management and conduct of the affairs, the complainant purchased eighty-five shares (at the times set forth in the bill) amounting to nine thousand eight hundred dollars and sixty-nine cents, they having been purchased at an advance. That in the month of December one thousand eight hundred and twenty-four the affairs of the company were in a highly prosperous state, the capital stock being securely invested according to the provisions of the charter and a dividend of six per cent. out of the surplus profit being declared about this time. The bill then showed, that at an election for nineteen directors for the ensuing year, the defendants among others (naming all of them) were elected, accepted office and took upon them-

selves the duty thereof; and that in the month of October one thousand eight hundred and twenty-five, on the death of the former secretary of the company, one *Oliver G. Kane* was appointed secretary, and who was well known to some of the directors last mentioned to have been reputed a person addicted to gambling and otherwise exceptionable in point of character and that such reputation existed respecting the said Oliver G. Kane at the time of his election as secretary. That, notwithstanding such knowledge of the character of the said Oliver G. Kane, no security was taken by the said directors for the faithful discharge of his duty; that within less than one year from the appointment of the said Oliver G. Kane he was permitted to exercise almost the sole control and management of the affairs and business of the office respecting the monied concerns thereof and so continued until the time of his death and had the custody of the valuable securities appertaining thereto ; and that Frederick Depeyster was elected president at the commencement, and so continued until after the decease of the said Kane. That the said Frederick Depeyster, the president of the company, committed the management of the money concerns to the said Kane, without examination or control, all which was well known to the said directors, And the complainant charged, that the said Frederick Depeyster became and was entirely negligent of the state and condition of the company soon after the appointment of Kane as secretary and which was also well known to the said directors. That by a resolution of the directors passed the ninth of December one thousand eight hundred and fifteen all monies received for subscription were directed to be invested in United States stock ; and that by a subsequent resolution, all monies received from time to time for premiums of insurance were directed to be invested in similar stock or state stock, and which was well known to the said directors. That notwithstanding these resolutions, the directors, in violation of their duty, permitted the capital stock or a great portion thereof to be sold and converted into cash, which, together with the premiums, was applied to the discounting of notes and to the

1832.

SCOTT
v.
DEPEYSTER.

carrying on of banking, whereby the same became a cash capital and was left entirely to the management and control of the said Oliver G. Kane during a great part of the period he acted as secretary. That no bye-laws were made during the time he was secretary. That in one thousand eight hundred and twenty-five the said Oliver G. Kane fraudulently withdrew from the funds of the Company twelve thousand dollars and upwards, in the next year the further sum of eighty thousand dollars and upwards, and in one thousand eight hundred and twenty-seven the sum of eighty-seven thousand dollars and upwards, and which amount had been entirely lost to the company.

The bill went on to show the reappointment of the defendants as directors; and the dividends they declared. Also, that the books and accounts were never inspected or examined by the said directors. That sometime in January one thousand eight hundred and twenty-eight the said Oliver G. Kane committed suicide; and the loss by him was estimated at about one hundred and eighty thousand dollars. That the shares of the complainant had depreciated thereby fifty per. cent, and he had applied to the directors to make good the same. The complainant prayed, that the defendants might come to a full and fair account of the amount of his stock lost and depreciated by their illegal acts and gross neglect in the premises; and might pay and satisfy the complainant the amount of his loss on the stock, by reason of their impairing the capital of the said company contrary to law; and that what might be found due to the complainant on such account might be paid to him. And for further relief.

The nature of the answers of the different defendants may be gathered by an abbreviation of the separate one put in by Frederick Depeyster. This defendant set forth the provisions of an act amendatory to the one which constituted the company, whereby it was declared to be lawful for the president and directors to regulate the amount and terms of payment for the stock subscribed or to be subscribed and the investment thereof, provided the same was not inconsistent with the pro-

visions of the eleventh section of the original act, thereby giving to the president and directors authority to employ or invest the funds of the company in whatever way the board might deem most advantageous. And after taking notice of the formation of the company and admitting certain of the statements in the bill, the defendant went on to say and admit the appointment of Kane as secretary ; and that no security was taken from him, the same never having been required from any former secretary of the company nor, as the defendant believed, by any other insurance company. That this defendant attended the election and was one of the directors opposed to the election of the said Oliver G. Kane ; and denied that he was opposed by any of the directors on the ground of his being a gambler and man of bad character. That it was utterly untrue that the said Oliver G. Kane at any time during his connection with the company as secretary was permitted to exercise the sole or any control over the monied concerns thereof ; and also untrue, that the said Kane had, at any time, the custody of the valuable securities of the company, or that this defendant committed the management of the monied concerns of the company to the said Kane without examination or control. The defendant then went on to show the nature of his duties daily as president and averred that he performed them faithfully. And also, that it was the particular duty of the secretary to make out and register all policies of insurance entered into by the company, to keep the books and accounts, to receive all notes and money paid into the office of the said company whether for premiums or otherwise, to enter said notes in the bill book, after being approved of by the president, and deposit them in the bank for collection, after being endorsed by the president, and to deposit, in like manner, all monies received to the credit of the said company and to make out and render an account of the affairs of the company at stated semi-annual periods to be laid before a committee appointed to examine and report on the same to the board of directors. That it was the established usage of the company to have a statement of its affairs prepared by the secre-

tary monthly and laid on the table at the monthly meetings for the inspection of the directors, and that the statements were made out and contained as follows :—1. The amount of outstanding risks at the commencement of the month and the premiums thereon. 2. The amount of risks taken by the month and the premium thereon. 3. The amount of arrivals or risks written off during the months and the premiums thereon. 4. The balance in favor of the company on their settled transactions at the commencement of the month, including therein the amount of premiums written off during the month and every other matter or thing that might have been received in the interval by way of profit. 5. On the other side against this was charged all monies disbursed during the month for loses, return premiums, averages and every other matter constituting a charge against the company. That a *pro forma* statement, setting forth the unsettled claims and demands, was always annexed to said monthly statements, to the end that each statement might be as perfect an exhibition of the state of the company as the utmost care and precaution could furnish ; and that these statements were again a check upon the semi-annual general statements, while this defendant's account of the premiums for the month was in like manner a check on the account of the same matters kept by the secretary. That no other duties were imposed upon and no other trusts confided to the said Oliver G. Kane than were necessary and usually imposed and confided in all companies from the nature of the office ; that his particular agency in the business of the said company, over and above what has been mentioned, was to make calculations of interest which were always checked and revised by the defendant, to fill up checks when required and to endorse and countersign the same after they were signed by the defendant; that he was not permitted nor did he ever presume to interfere in any of the defendant's duties, nor did he ever in any way in the course of business interfere with the money concerns, the same being at all times managed by this defendant with the aid of committees appointed from time to time by the company: the only part which he, the said Oliver G. Kane,

took in the business of the company being that which related to the performance of his duty and which appertained to him as secretary and being the same, in all things, with those performed by secretaries of other companies and by his predecessor in the said office. That, from the time the said company first commenced operations, this defendant made it a rule, from which he never departed, to enter all notes received, whether for premiums or on investments of funds or otherwise, in a book kept by the defendant or assistant president, and after they were thus duly entered they were delivered to the secretary to be regularly entered in the bill book, and these notes were then, once in every week, after having been examined by the defendant or assistant, delivered to the secretary to be deposited in the bank of America for collection on account of the company, a duty which the said Oliver G. Kane always honestly and truly performed, as this defendant verily believed, except in the solitary instance of the note of William Bloodgood for two thousand dollars embezzled by him shortly previous to his death; and it was also the duty of the said secretary, and duly performed by him, to render to the defendant an account of all the notes falling due and payable in each month. That it was the established rule and usage of companies, and he made it his own rule, that all monies paid at the office should be paid into the hands of the secretary and by him be deposited in the bank to the credit of the company. That all these monies so received were regularly charged as deposited and so appeared to this defendant from the bank book duly presented to him by the said Oliver G. Kane from time to time as such deposits took place or were alleged to have taken place. That for greater correctness and security, he had established it as a rule in the office of said company never to allow any payment of money, except by means of a check on the bank; and that accordingly checks were frequently drawn for small sums, which checks, as this defendant has since discovered, were altered into larger sums by the said Kane and the company defrauded. Denied that the capital was applied to banking purposes. Admitted that the said Oliver G. Kane did, at dif-

66

ferent times, defraud the said company of heavy sums of money, amounting in the aggregate, to one hundred and seventy-nine thousand one hundred and sixty-six dollars, of which ten thousand three hundred dollars, less the expenses of collection, had, by the most indefatigable exertions of the said directors, been recovered, thereby reducing the defalcation or plunder to one hundred and sixty-nine thousand six hundred and twenty-six dollars and five cents, of which amount it appeared that ten thousand and forty-one dollars and six cents was taken by the said Kane in the year eighteen hundred and twenty-five, the sum of seventy-six thousand one hundred and sixty-nine dollars and forty-eight cents in eighteen hundred and twenty-six, and the sum of ninety thousand nine hundred and fifty-five dollars and sixty-three cents in eighteen hundred and twenty-seven and also a promissory note of William Bloodgood for two thousand dollars. Admitted that dividends were made, which were presumed to come out of the profits; and explained what the balances in favor of the company were at the different times made out and thought to be, after a scrutiny by an examining committee. That on the twenty-seventh day of December eighteen hundred and twenty-seven, according to the established usage of the company, an examining committee was again appointed, consisting of David Hadden, James K. Hamilton and Jacob P. Giraud; that the said James K. Hamilton immediately thereafter notified the said Oliver G. Kane of the appointment of the said committee and enquired of him whether he had completed his semi-annual statements, and if so, what day he would be prepared to lay them before the said committee, to which he replied that his books were nearly all written up and that he would have all in readiness on the fourth of January one thousand eight hundred and twenty-eight, on the third of which month he destroyed himself. That the mode pursued by the said examining committees was the same that a vigilant merchant would pursue in the examination of his own concerns. The defendant then set forth the course pursued on these examinations; and averred as to the strictness of them. That on no occasion was the management of the

concerns of the company entrusted to the said Oliver G. Kane. That until the event of suicide took place, no suspicion attached to the character of the said Kane ; on the contrary the defendant and, as he believed, all the directors considered him to be a man of the most unquestionable integrity and of correct and moral deportment, he being, at that time, a married man with a little family dependent upon him and, as they had learnt, nothing to the contrary, praiseworthy in his demeanor. That a strict investigation, resulting from and directed by the said occurrence, and which could only have been suggested or justified by it, immediately thereupon took place and was made by James K. Hamilton, as president of the said company, with the aid of a special committee. That this investigation was much embarrassed by the destruction of most of the books and vouchers, which must have taken place a few days before the death of the said Oliver G. Kane and in contemplation of flight on his part. That they found, on this investigation, he had destroyed the following books and vouchers, namely, the bill receivable book, the bank of America check book containing part of the transactions of the years eighteen hundred and twenty-six and eighteen hundred and twenty-seven, the president's private book for recording all bills and notes received by the company, the book containing a list of monthly collections of bills receivable, the cash deposit books with the bank of America and the note deposit book with the same bank, in which every note deposited by the company was entered to the credit of the company by the person appointed to receive such notes at the bank, and also all the cancelled checks of the company to the years eighteen hundred and twenty-five and twenty-six and until November eighteen hundred and twenty-seven. The defendant then showed the resources to which the said James K. Hamilton went in order to get at the amount of defalcation. That from the said investigation, it was apparent the frauds of the said Kane were perpetrated by means of gross forgery by which the officers and directors were deceived ; and that the said forgeries occurred chiefly in the branch of the business of the office where, from the extreme prudence

1832.

SCOTT
*v.*
DEPEYSTER.

of the president, it might be least expected and where suspicion would least attach. The defendant set forth the number of shares then held by each of the said directors; showed how all the securities, save Bloodgood's note, were found safe in the usual place of deposit after Kane's death; stated more particularly the losses in connection with the dividends; and averred that such losses were to be ascribed to the extraordinary character of the frauds and forgeries of the said Oliver G. Kane and not to any omission of proper supervision and examination on the part of this defendant or the other directors of the said company; and ended by saying that the stockholders had manifested their undiminished confidence by a re-election of the same board of directors.

As the question in this case was upon the personal liability of the defendants and the matter at issue sufficiently appears from the abstract which we have given of the most important of the pleadings, it is deemed unnecessary to recur to the testimony; more especially as it is referred to in the opinion of the court.

Mr. *M. C. Paterson* and Mr. *Hugh Maxwell* argued for the complainant on the following points:

I. The defendants having admitted the fact, that the capital of the company was not invested in the securities and in the mode prescribed by the original act of incorporation, they are responsible for the amount of the loss at all events.

II. If the defendants were not bound to invest the capital in the securities and in the mode prescribed by the original act of one thousand eight hundred and fifteen, yet, that the employment of the capital in discounting notes was in violation of law; and, on this ground, the defendants are responsible at all events.

III. That the defendants, as trustees acting without reward,

have been guilty of gross negligence in the management of the trust and are, therefore, responsible.

IV. The defendants, as agents for the complainant in the management of a business from which they were to derive a reciprocal benefit, are responsible for the want of ordinary care and attention.

Mr. *John Anthon* and Mr. *George Griffin,* for the defendants, based their argument upon these points:

I. The answers of the several defendants are fully responsive to all the charges of negligence and mismanagement in the complainant's bill and cast the onus upon him of establishing his charges by full proof.

II. In this he has totally failed : his witnesses proving on the contrary, that the business of the company was conducted in the way common to all similar companies and that the directors (the defendants,) in the examination of their accounts, not only pursued the usual and uniform course adopted by all similar institutions, but were, in truth, more rigorous than any other set of directors in such examinations—having pursued a course of examination as particular as a vigilant merchant could pursue in the examination of his own accounts.

III. In such examination, they were imposed upon by forgery managed with such adroitness on the part of an unsuspected officer as to baffle detection until carried to excess and then discovered upon an investigation originating in the suicide of that officer.

IV. When the directors of a company pursue the usual and uniform method adopted by similar institutions, they cannot be subjected to the charge of negligence.

V. The responsibility of stockholders in choosing directors,

of directors in choosing the president and secretary, of the president in superintending the secretary, of the directors in superintending the general concerns of the institution and of the stockholders in superintending the directors, are all variant according to the nature of the charter and the essential constitution of all incorporated companies; each must, therefore, be responsible in his own sphere. No foundation is laid in the bill nor in the proofs for such discrimination.; and if such foundation had been laid, no negligence, charging either in his sphere, has been proved.

VI. No conclusions, charging the *directors specially*, can be drawn from the course of the business of the company, whether the same was or was not authorized by the charter. Marine Insurances, loans on respondentia, and the discounting of notes, having been, from the origin of the company, the open and established business of the company, known in fact or in law to every stockholder, and the directors being chosen by the stockholders to represent them in the transaction of such accustomed business.

VII. The complainant, in common with the other stockholders, being chargeable in law or in fact with a *scienter* in this behalf and reaping the profits of such business so conducted, cannot now be allowed to aver that such course of business was not sanctioned by the charter.

VIII. Each branch of business was fully sanctioned by the charter; marine insurances and loans on respondentia expressly, and the discounting of notes by plain implication and inference.

IX. The restraining act guards against the evil of unauthorized individuals and companies keeping an office of deposit for the purpose of discounting which thus becomes a branch of banking; but does not interfere with the right of an individual or company investing surplus funds by temporary loans or

notes by way of discount, where an office of deposit is not connected with such discounting.

1832.

SCOTT
v.
DE PEYSTER.

X. The amended charter removes all restrictions from the company as to the investment of their funds; and leaves them at liberty to invest by discounts or otherwise as they may see fit.

XI. The proviso of the 6th section, that the regulations of the company shall not be repugnant to the constitution and laws of the State, does not control this right.

1. Because it is not inconsistent with the restraining act.

2. If inconsistent, that statute, as to this company, is impliedly repealed by the amended charter; and the true meaning of the proviso then being, that the company shall not violate any laws not expressly or impliedly repealed by such amended charter.

XII. The law and the testimony are both, therefore, clearly against the complainant's prayer that the defendant may account with him and pay him the amount of loss he had sustained by reason of the fraud and forgeries of their common servant.

The VICE-CHANCELLOR. This is a bill by one of the stockholders of the National Insurance Company, in behalf of himself and all others who may come in and contribute to the expenses of the suit, against the president and directors of the same company, in their individual capacities, to compel them, personally, to account for and make good the losses sustained in the capital stock of the company by the frauds and embezzlements of their secretary.

*April 8, 1832.*

This company was incorporated by an act of the legislature in one thousand eight hundred and fifteen. The capital was not to exceed five hundred thousand dollars, divided into

shares of one hundred dollars each. Its actual capital appears to have been only three hundred and one thousand and eight hundred dollars.

The property and concerns of the company were placed under the management of nineteen directors, chosen annually; and one of them was president. Eight of the present defen- dants were original directors named in the charter; and they, with all the other defendants (excepting one or two) were also directors from the year one thousand eight hundred and twenty- four, to one thousand eight hundred and twenty-eight, having been duly chosen each year. Mr. Depeyster was their president.

In October one thousand eight hundred and twenty-four, they appointed Oliver G. Kane the secretary of the company. While acting as such secretary and in the course of the years one thousand eight hundred and twenty-five, one thousand eight hundred and twenty-six and one thousand eight hundred and twenty-seven he managed to abstract money from the funds of the company to a large amount, without the knowledge of the defendants or exciting, in their minds, the least suspicion of his want of fidelity.

He appropriated these funds to his own immediate use or expended and lost them in gambling and other immoral pur- suits to which he was secretly addicted; and, despairing of being able to conceal his embezzlements any longer, he, on the third of January one thousand eight hundred and twenty-eight, terminated his career by suicide. This event led to a tho- rough investigation of the affairs of the company and to an ex- amination of its property and effects. The result showed a loss sustained by Kane's fraudulent and felonious conduct of, rising, one hundred and seventy-nine thousand dollars.

The object of the bill in this case is, to throw the entire loss upon the directors individually, under whose administration it happened. No objection has been taken that the company, in its corporate character, is not made a party to the suit.

The large amount involved in this controversy and the great importance of the principles relating to the personal liability of managers and directors of monied corporations which the

case embraces, added to the high character of these defendants for intelligence, wealth, experience in business and probity in all their social and public relations, give to it an unusual degree of interest and have induced me to bestow upon it my best attention. At the same time, I can hardly hope that the conclusions at which I shall arrive, will be so entirely satisfactory as to put an end to the controversy. The matters now before me may, hereafter, be the subject of consideration by others. Present duties are mine; and in endeavouring to discharge them, I have sought only to satisfy my own conscience upon what I conceive to be the law and the facts of the case.

It may be observed, at the outset, that it is not attempted in this case to charge the defendants upon the ground of fraud or wilful disregard of their duties. Whatever allegations to this effect may be found in the bill, the complainant now admits that the testimony has wholly failed to make out such a case. But he insists they have rendered themselves liable, in the first place, by employing the capital or funds of the company in discounting notes and in other operations contrary to law, instead of investing them in more permanent securities and in the modes prescribed by the act of incorporation; and, in the second place, by gross neglect and inattention to the affairs, property and concerns of the company during the time Kane was secretary and while the depredations were committed.

The first enquiry, therefore, which seems to be called for is, whether the defendants, as directors, have disregarded the requirements of the charter and the general laws of the state in relation to the objects of the corporation and the investment or employment of its capital? And if this shall be ascertained, then, as to the effect it is to have upon the defendants?

By the act of incorporation, the company are authorized to make all kinds of insurance, except against fire, to lend money upon bottomry and respondentia, and generally to perform all matters and things relating to those objects. The fourteenth section provides, that before the president and directors of the company assume any risk, in pursuance of the act, the amount of the capital subscribed for in the company shall be paid to

67

1832.

SCOTT
v.
DEPEYSTER.

the president and directors; and by them securely invested in the public stocks, funds or debts of the United States or of this State or in the stock of the incorporated banks of the city of New York or loaned to individuals upon bond and mortgage of real estate. Certain restrictions are imposed by the eleventh section: the company are forbidden to deal or trade in buying or selling any goods, wares, merchandize or commodities whatsoever, and in buying or selling any stock created by act of congress or of any particular state—with this qualification: unless, in buying, the object be to invest or secure its capital stock or some part thereof or, in selling, to pay its debts or to re-invest the same in other stocks or when the property to be sold has been pledged by way of security for debts due to the corporation. Thus, clearly, I think, marking out the distinction as to the powers of the company between dealing or trading generally and buying and selling for the mere purposes of investment and re-investment and securing debts: the first being prohibited and the last a privilege or right allowed to them. The directions of the fourteenth section, as to the stocks and kind of securities in which the investments should be made, preliminary to the business of insurance, is in perfect harmony with the restriction in the eleventh section.

But it appears the company met with great difficulty in getting into operation under the imposing conditions and requirements of the fourteenth section. They found their stock would not be taken up, if the subscribers were obliged to pay in the whole amount in cash; and the company could not commence business until this was done and the money actually invested. In order to enable them to dispense with these prerequisites, an amendment of the charter was necessary. It was accordingly applied for and an act was obtained in one thousand eight hundred and sixteen; by which it was declared to be lawful for the president and directors to regulate the amount and terms of payment for the stock subscribed or to be subscribed and the investment thereof.

This was, doubtless, intended as an enlargement of the powers and authority of the president and directors.

They were now at liberty to receive payments towards their capital stock by instalments; could take, what are denominated, stock notes, with or without indorsers; and arrange the same as they pleased. They also had power to regulate the investment of the funds, when paid in. But the legislature appear to have been very cautious in the grant of this power: for they declare, by way of proviso, that the regulation of the investment (if the proviso is to be confined to that) shall not be inconsistent with the provisions of the eleventh section of the original act. Thus, the president and directors, in making investments, were bound, at all times, to have a due regard to those provisions, and which, as already shown, only go to restrain them from becoming "dealers or traders" in merchandize and stocks. There is no express provision beyond this, either in the incorporating or amendatory act. Still, it is very doubtful, whether the power to regulate the investments, means any other investments than such as were originally authorized and in the kind of property and securities mentioned in the act: since no other mode of investment is any where spoken of, and to invest in this manner and in such securities might require it to be stated by what bye-laws and regulations as to time and sums and by what committee of directors and whether it should be done in state or United States stock, indeed, whether in stocks at all or on bond and mortgage only; and, perhaps, as to other particulars. Therefore, without looking beyond stocks and bonds and mortgages, enough may be discovered to which the terms " and to regulate the investment " thereof" may apply.

But there is another view of the subject which renders it still more doubtful whether the use of the words just quoted conferred an authority to employ any portion of the capital in discounting notes or other business usually transacted by banks. The business of this company, and for which it was incorporated, is insurance and lending money on *bottomry* and *respondentia.* Although not expressly limited or restricted to these objects and not, in terms, prohibited from any other, it by no means follows that, because there is no express prohibition in

1832.

SCOTT
v.
DEPEYSTER.

their charter, the company was authorized to discount or loan money upon promissory notes. Such a use or employment of their capital or any considerable portion of it would rather seem to be a branch of business assumed by the company than a mere matter of investment collateral to the declared objects and legitimate business of the corporation. The opinion of a majority of the judges of the supreme court, delivered by Chief Justice *Thompson*, in the case of *The People* v. *The Utica Insurance Company*, 15 *J. R.* 358, contains certain principles which appear to be decisive of this point. Among others are the following, that the specification of certain powers operates to restrain a corporation to the object of such powers and is an implied prohibition of the exercise of other and distinct powers; and, that the powers to invest its funds, in broad and unqualified terms, might be sufficient to authorize banking operations, were it not for the general restraining law which converted the privilege of banking into a franchise. When, in connection with the power to invest, other ways are pointed out in which funds may be invested besides in banking business, he held it to be a forced use of the term "investment" to apply it to an active capital employed in banking, since it is usually applied to a more permanent and inactive disposition of money; and, although it might extend to banking, yet it ought not to receive that interpretation, where another sense, more obvious and consistent with the general objects of the incorporation, can be given to it.

Applying these rules to the present case, they establish the position that, under the authority to invest, although there may not be an express prohibition in the charter against banking, the company was not authorized and could not lawfully discount notes or transact other business which banks usually perform. For the purpose of investing its capital, other modes were pointed out; and it was not necessary they should resort to this. The restraining law of one thousand eight hundred and four, reenacted in the revision of one thousand eight hundred and thirteen and in force when this company was incorporated, operated, according to *C. J. Thompson*, to restrict the

powers of the company to the modes of investment expressly mentioned in the charter and precluded all other. It is true he did not place the opinion of the court in the case just cited solely upon such ground; for he also considered a clause in the charter of that company as sufficiently restrictive and prohibitory. And, in the subsequent cases of the *New York Firemen Insurance Company* v. *Ely*, 2 *Cow.* 678, and the *North River Insurance Company* v. *Lawrence*, 3 *Wend.* 482, the opinions delivered by *C. J. Savage*, against the right of the companies to discount or lend money on promissory notes, proceeded mainly upon the effect of similar clauses in the charters of those companies; and yet, without such clauses, the law may well be as laid down in the first instance—the decision upon both grounds being perfectly consistent with each other.

The further act of one thousand eight hundred and eighteen, prohibiting the keeping of an office of deposit and imposing penalties, could only be resorted to, according to the construction which it has received, when an office of deposit for such purposes as are forbidden has actually been established; and I do not perceive, from the testimony before me or the answers of the defendants in this cause that they are brought within the reach of its provisions. But, if the views I have taken of the powers of this company and the effect of the restraining act are correct, then, enough appears, from the admissions of the defendants, to show that the company have gone on for many years employing their capital and funds in a manner not warranted by their charter and have transacted business from which they were expressly prohibited by law. They commenced very early to discount notes and resorted to that method of investment as well as to stocks—and bonds and mortgages, and it is admitted, that the amount of notes, besides other investments and loans on bottomry and respondentia, was, upon an average and during the time Kane was secretary, two hundred and ninety thousand dollars per annum. By this means a large proportion of their capital was kept in circulation; and I cannot but think it was in a manner unauthorized by law.

There is no reason to suppose, however, that the directors

1832.

SCOTT
*v.*
DEPEYSTER.

knowingly and intentionally violated the law in this respect. It, doubtless, proceeded from an honest but mistaken view of the powers granted to the corporation over which they presided; mistake in a matter of nice construction of law, depending upon the meaning of terms, susceptible, perhaps, of a two fold application. The directors of the Utica Insurance Company, incorporated about the same time, namely, in one thousand eight hundred and sixteen, and with powers not more ample, fell into a similar error and were not convinced of it until a decision was had against them; and even then, so doubtful was the question, that the strong and luminous mind of Mr. Justice *Spencer* happened to be arrayed on the side of the company in favor of their construction and against the Attorney General and a majority of the bench. It is not at all surprising, therefore, that these defendants should have formed misconceived notions of the extent of their corporate powers and have persevered in them so long.

The next question then is, in regard to the effect which this is to have upon the rights of the parties to the suit?

I thus limit the inquiry to the rights of the parties, because it is not now a question, with the company in its coporate capacity, whether it has forfeited its charter, nor between the company and individuals, with whom they have dealt, whether the contracts made in discounting notes or lending money are such as could not be enforced at law : but, it is a question between the corporators, who, on the one hand, are stockholders and persons, on the other, standing in the relation of trustees, whether they are to be held responsible for an innocent mistake or error of judgment in regard to their corporate rights and privileges? It seems to be perfectly clear, both from reason and authority, that they are not. Even if a loss had accrued as a direct and immediate consequence of their error, still, without any other fault on their part, the law, from the wisest policy, would excuse them. No man who takes upon himself an office of trust or confidence for another or for the public, contracts for any thing more than a diligent attention to its concerns (sometimes differing in degree) and a faithful and honest dis-

charge of the duty which it imposes. He is not supposed to have attained infallibility; and does not, therefore, stipulate that he is free from error. To hold that the law requires this of any man is to suppose him incapable of erring; and to establish it as a rule that men are to be responsible for mistake or error of judgment, while acting in good faith, would put an end to all offices of trust—since no one who is capable or worthy could be found to accept of them. And yet, without such offices, neither the affairs of the public nor of individuals, to any extent, could be conducted. The principle applicable to this branch of the case is to be found in several adjudged cases. The decision in *Harman* v. *Tappenden*, 1 *East*. 555. is a direct authority for it. So in *The Attorney General* v. *The Coporation of Exeter*, 2. *Russ*. 45. it is laid down that where trustees of a charity, under an instrument of doubtful construction, have acted honestly, although erroneously, they will not be charged in respect of past misapplication of the funds. And in *Crookshanks* v. *Turner*, 7, *Br. P. C.* 255, it was decided, that a trustee should not be answerable for a mistake committed innocently and from which he derived no advantage and a court of equity would grant a perpetual injunction to prevent proceedings at law grounded upon such mistake. The case of *Gray* v. *Chaplin*, 2. *Russ*. 126. may also be cited for the same purpose, as well as in support of another view which has been urged upon the argument, that the complainant and the stockholders generally acquiesced in the course of business pursued by the company and participated in the results, and, therefore, have no right to object or complain.

There does not appear to have been any concealment of the fact, that a large portion of the capital was employed in the manner alleged. Large dividends, founded upon statements, showing, among other property, the amount of bills receivable belonging to the company, were made semi-annually and for a number of years in succession. These statements must have been open to the inspection of stockholders. I think the inference is a fair one, that they became acquainted with the nature of the business which the company was pursuing; and especially

1832.

SCOTT
*v.*
DEPEYSTER.

the complainant, who appears to have increased his stock from year to year by the purchase of additional shares—evincing thereby his entire satisfaction with the management of its concerns. The same directors were generally rechosen every year. But little change took place in this respect. The course of business appears to have been very uniform and without objection from any of the stockholders, and, therefore, to say that they have acquiesced and are bound by such acquiescence, as between themselves and the directors, is not unreasonable. The acts of the directors were done by them in their official capacity ; and if those acts met with the express or implied sanction of the stockholders, they became the act of the corporation and binding equally upon all the corporators, although, as to the public or third persons, such acts may have been illegal. So it is clear, that whatever illegality there was attaches, not to the directors individually and solely, but to the whole corporate body including the stockholders ; and upon no principle whatever can the directors be responsible to the stockholders or the stockholders to the directors for any thing growing out of such illegal transactions. They are *in pari delicto*—the one party in performing and the other in sanctioning acts, as those of the corporate body which they collectively composed. For these reasons, I am satisfied the unauthorized or illegal transactions of the company do not furnish any ground which would hold the directors responsible to the stockholders even if a loss to the company had been the immediate and direct consequence. Much less, then, can there be any liability of the sort when no loss has actually accrued from this cause. No direct injury has resulted from investing the capital or funds in promissory notes. Not one discounted note has been purloined or lost to the company. The depredations were not committed upon the securities, but upon the cash of the company, in the manner which I shall hereafter particularly notice ; and the losses of money in this way do not appear to have been a direct or natural consequence of the investment in notes. And, whether their funds to a large amount were constantly circulating through the bank with which they

dealt, by reason of their discounting and depositing notes for collection, or, whether they deposited for safe keeping or in order to await other investments and opportunities to loan on bottomry or respondentia, the funds would have been liable to the same practices which were resorted to for the purpose of abstracting them. It is probable, however, that opportunities for the accomplishment of such designs to a greater extent were thus afforded. Still, this does not make out that the loss was a direct consequence of discounting notes. It was, after all, but a remote one. The money was obtained by reason of its being in the bank, and in consequence of the bold villany and adroitness of the secretary in altering and forging checks; and, from whatever cause or by whatever means the money happened to be there, the effect, under such circumstances, would have been the same.

A bank is deemed by all to be a place of safety for funds (and it certainly was lawful for the company to lodge their means in the bank for any temporary purpose,) while forgery is a crime which cannot always be prevented and against which no human foresight or prudence can be an effectual protection.

This case, then, must be examined upon other grounds. The mere fact of the company's funds being kept in the situation just described and lost by embezzlement or forgery is not sufficient to charge the directors. By appointing Kane to the office of secretary, they did not become sureties for his fidelity and good behaviour. The law casts no such responsibility upon the directors of any corporation. If they select persons to fill subordinate situations who are known to them to be unworthy of trust or notoriously of bad character and a loss by fraud or embezzlement ensues, in such a case a personal liability rests upon them: but not otherwise.

The bill charges misconduct in this respect upon the directors in appointing Kane their secretary by alledging, that his being addicted to gambling or reputed to be so, was well known to them and also that his character was otherwise exceptionable, and that, notwithstanding such knowledge, they

68

elected him without taking or requiring from him any security for the faithful discharge of his duty. It is proved not to be customary to take security from secretaries of Insurance Companies ; and it was dispensed with in this instance. The other branch of the allegation is fully denied by the answers of the defendants. They severally declare they had no knowledge or suspicion of his being addicted to gambling or of there being any thing exceptionable in his character or habits. Even Mr. Hone, who was most instrumental in favor of his election, declares, that so strong were the convictions of his mind as to the integrity of character and conduct of Kane at all times, that, had it been customary to exact security and he, Mr. Hone, had been requested, he would have signed the necessary bonds. An effort has been made to disprove these denials and particularly the declarations of Mr. Hone; but, without success. The charge of impropriety in relation to the choice of Kane as secretary, consequently, fails.

I now come to the more important considerations, growing out of the transactions of Kane and the alleged misconduct of the president and directors in relation to the care and management of the property of the company after he became their secretary.

This leads to an inquiry in the first place, as to the manner in which Kane's depredations were committed, (for much may depend upon the means he employed, the acts and contrivances used by him to avoid detection, and the adroitness with which he managed to deceive the president and directors)—whether it was owing to any remissness on their part that it was continued so long without discovery ? and, secondly, what sort of care and attention is required of directors in institutions like this and what constitutes negligence and the degree of it which is necessary to render them liable ? The bill charges that Kane was permitted to act as he pleased in conducting the affairs of the company, by managing the monied concerns and keeping the valuable securities ; and that, in the course of the year one thousand eight hundred and twenty-five, he fraudulently withdrew twelve thousand dollars and upwards from

the funds of the company, in one thousand eight hundred and twenty six the further sum of eighty thousand dollars and upwards, and more than eighty-seven thousand dollars in the year one thousand eight hundred and twenty-seven. And the particular interrogatories require the defendants to answer as to what amounts were withdrawn in those several years, how the same appear, and from what documents, entries or papers the amount of the respective defalcations is ascertained—and to state the same fully and particularly.

The answers generally deny that Kane was permitted at any time to manage or control the monied concerns of the the company or that he had the custody of the valuable securities appertaining to its affairs and business. They specify the amounts which he defrauded the company of in the course of each year, differing somewhat from the sums stated in the bill, but deny that it proceeded from any neglect of the president and directors ; on the contrary, they say it was accomplished by his artful frauds and bold forgeries ; that from the investigation which afterwards took place, it was apparent the forgeries occurred chiefly in a branch of the business of the office where, from the prudence of the president, it might have been least expected and where suspicion would least attach ; and that it was the uniform practice of the president, for greater caution and certainty, to allow no payment of money to be made in the course of the business of the company, except through the medium of a check on the bank signed by the president and countersigned by the secretary, and which, according to the established usage of Insurance Companies, were filled up in the hand writing of the secretary and, therefore, well known to the bank. The answers go on to say, that checks thus filled up for small amounts, such as five, seven or nine dollars, and signed and countersigned for the purpose of paying such bills presented against the company, instead of being delivered to the person presenting the bills, must have been retained by the secretary and the amount paid by him in cash to the person entitled to receive it and the checks thus remaining in his possession then altered from units to thousands, and by that means, instead of five, seven or nine

dollars being drawn from the bank, as many thousands were abstracted and applied to his own purposes—and in order to conceal from the president and directors the fact of drawing such amounts from the bank, a duplicate set of false and forged books were artfully imposed upon them in every instance when the books were resorted to by the president or examining committees for information, the true and genuine bank books, which would have led to detection, being withheld. They further say, that upon examination, it was also discovered that money received in the office in the course of business, paid to the secretary and which he was bound to deposit according to established usage, was embezzled by him from time to time and the fraud concealed by forged books and entries in like manner.

The defendants have also stated, very particularly, the manner in which the examination was conducted in order to ascertain the amount of the losses or defalcations; and the books, documents and entries they had recourse to for the purpose (those containing the direct and positive evidence of his embezzlements and forgeries having been destroyed a short time before his death and, as they supposed, in contemplation of flight;) and they show how it is made to appear that two modes of abstracting their funds were practised: one, by embezzlement of sums paid at the office which he appropriated to his own use instead of depositing the same in the bank, at the same time making entries in the books of the company as if the monies were actually deposited and forging a bank book to correspond—the other, by altering checks as before mentioned to a large amount, making entries in his books to correspond with the sum originally intended, and also in the forged and fictitious bank book kept by himself for the purpose of deceiving the president and examining committees.

Whether the statement in the answers on this subject is to be considered as called for by the bill, and, therefore, evidence in the cause, it seems not necessary to determine, since the facts appear to be sufficiently proved by the testimony of Mr. McNeal, who was examined as the complainant's witness. Although

neither he nor any other person could undertake to testify from their own knowledge what were the means used to accomplish these extensive depredations or in how many ways the frauds were perpetrated, yet, considering they were chiefly confined to the money of the company in the bank, and to such as was occasionally paid in and received at their office (only one promissory note of two thousand dollars, arising out of an insurance transaction, ever having been purloined) I think it is manifest, from the nature of the case as well as from the facts ascertained by Mr. McNeal in the course of his investigation as testified to by him, that no other modes of surreptitiously obtaining the funds of the company were pursued than the two just mentioned—and there appears no room to doubt that both were occasionally practised.

If this be so, then no blame can attach to the president or any of the directors in respect to the mere act of embezzlement or the commission of forgery in altering checks. The funds were not needlessly or improperly exposed by them to the temptation of such crimes. They had a right to repose some confidence in the secretary of the company. His station required it of them; at least, so far as to allow him to receive whatever money was paid at their office in the course of business and have charge of such money for the purpose of depositing it in bank, and also to the extent of filling up checks to be signed by the president and himself and to be used and applied to the purposes for which the same were intended. All these were matters within the scope of the secretary's duties; and which, according to established usage, belonged to him to perform. He was, therefore, entrusted with them; and it was in these alone he betrayed his trust. How, then, can the president and directors be liable for the act of embezzlement or forgery merely? There was no collusion; and thus far, no want of care or prudence on their part. I know of no law which requires the president or directors of any monied institution to adopt a system of espionage in relation to their secretary or cashier or any subordinate agent or to set a watch upon all their actions. While engaged in the perform-

ance of the general duties of their station, they must be supposed to act honestly until the contrary appears; and the law does not require their employers to entertain jealousies and suspicions without some apparent reason. Should any circumstance transpire to awaken a just suspicion of their want of integrity and it be suffered to pass unheeded, a different rule would prevail if a loss ensued. But, without some fault on the part of the directors, amounting either to negligence or fraud, they cannot be liable.

It is necessary, therefore, to pursue this case still further, and ascertain the kind of care and attention which it is incumbent on directors to bestow, and the degree of negligence which will charge them; and also, whether such negligence is justly imputable to the defendants in not having prevented, by an earlier discovery, the long continued and enormous depredations upon their funds. The first is a matter of law; and the last depends upon and is to be determined by the evidence. These enquires, in fact, involve the points most important in the cause and upon which it must ultimately be decided.

The persons who become directors or managers of a corporation place themselves in the situation of trustees; and the relation of trustee and *cestuis que trust* is thereby created, for the time being, between them and the stockholders. In the language of the charter of the present company, their duty is to manage the stock and property and conduct the affairs and concerns of the corporation, selecting one of their number for president: Sec. III. For the discharge of these duties they are chosen; and, by accepting the appointment, they assume a responsibility at least as extensive as that of any other description of trustees. In the civil law, a rule prevails which, I think, may, with great propriety, be applied here. It is this, that "those who are named by companies and corporations "to have the direction of their affairs, are obliged to take the "same care and diligence as factors or agents. They are an- "swerable not only for any fraud and gross negligence which "they may be guilty of, but also for all faults that are contrary "to the care required of them:" *Domat, book 2, tit. 3, sec.* 9

In order to determine what is contrary to the care required of them, as superinducing a liability besides fraud and gross neglect, resort must be had to other rules; and these are to be found in the law of bailment which, according to its definition, fairly embraces the trust assumed by directors and places them in the light of bailees of the property belonging to the corporation. As directors are generally persons having an interest in the joint stock of the company, they are not bailees who are to derive no benefit from their undertaking and, therefore, to be held responsible for slight neglect; but they act in relation to a bailment beneficial to both parties (the stockholders and themselves). And the rule then is, that they must answer for ordinary neglect; and "ordinary neglect" is understood to be the omission of that care which every man of common prudence takes of his own concerns. The rules in the law of bailment are founded in reason and justice. They are of great practical utility and importance and serve as rules of decision both in courts of law and equity. The one to which I have adverted affords the proper test, in my opinion, to be applied to the conduct of parties standing in the situation of these defendants. I think the question in all such cases should and must necessarily be, whether they have omitted that care which men of common prudence take of their own concerns? To require more would be adopting too rigid a rule and rendering them liable for slight neglect: while, to require less, would be relaxing too much the obligation which binds them to vigilance and attention in regard to the interests of those confided to their care and expose them to liability for gross neglect only—which is very little short of fraud itself.

Taking what I have thus stated to be the true rule, I proceed to examine the facts in relation to the only remaining part of the conduct of the defendants which requires to be noticed, for the purpose of seeing whether their failure to discover the embezzlements and forgeries of Kane at their semi-annual examinations or at any other times was owing to ordinary neglect or the want of that care which common prudence required them to bestow.

1833.

SCOTT

*v.*

DEPEYSTER,

It is not pretended that it was the duty of the directors to attend daily at the office and examine the transactions and entries in the books kept by the secretary to see how far he was correct and regular. The testimony shows it not to be customary in insurance offices for directors to do so. Great confidence must necessarily be and generally is reposed in the secretary. The duties of his department require it ; and Kane's were very much the same as in all other companies. And much is likewise entrusted to the president. He has particular duties which the daily business of the company demands ; and these are, in some measure, distinct from those of the secretary. And besides these, he has the general management and superintendance of all the affairs of the company, sometimes being aided by an assistant president selected from among the directors for such purposes. It is not the practice for directors to attend or hold daily meetings at the office or to give their constant attention to the concerns of the company. Monthly meetings of the board appear to be all that are deemed necessary in the best conducted marine companies ; and, unless special business requires their attention, they are not oftener convened. Statements showing the result of each month's business, are made up and laid upon the table for inspection at such meetings ; and, at the close of every six months, an examining committee is appointed to investigate the affairs of the company preparatory to declaring a dividend. This is a brief outline of the modes pursued in managing the affairs of a corporation like the present. In answer to the charges of inattention on the part of the president and his absence from the office, leaving the control of the monied affairs to Kane, and that the directors, at the same time, paid but little attention to the affairs of the company and were entirely neglectful of their duties, the defendants, (besides expressly denying all this,) show the particular manner in which the affairs of the company were attended to and conducted by the president ; and also, that the duties of the directors, on all occasions requiring their attention, were carefully performed. This part of the answers is, I consider, responsive and as con-.

taining denials of the allegations in the bill, and, therefore, evidence in their favor. And the testimony of the officers of marine insurance companies, who have been examined on the part of the complainant, prove that the duties which are thus alleged to have been performed are the usual duties attaching to presidents and directors and evince no want of care, foresight or prudence in the general management and direction of the company's affairs. Indeed, so successfully was their business conducted under the system which they had adopted and pursued, in connection with the practice of the office—excepting the frauds of the secretary–that they were enabled, during most of the time, to declare half-yearly dividends of six per cent and sometimes larger, and have a considerable surplus of profits on hand to meet any contingencies.

1832.

SCOTT
v.
DEPEYSTER.

These circumstances appear to me to furnish a sufficient answer to many of the allegations and to much of the argument adduced to show a general want of attention and remissness of duty on the part of the defendants ; as, for instance, not making bye-laws, not holding more frequent and regular meetings of the board, and permitting the secretary to have too much control. And bye-laws are, moreover, proved to be unnecessary in such a company, and entirely dispensed with in many ; and even when adopted, it is certain they would not prevent the commission of crime or the devices of a fraudulent secretary. Nor is it shown, how they would lessen the temptation to the one, or the inducement to the other, where the person should be disposed to act criminally.

Consider this case, then, as respects the general conduct of the defendants in the management of the property and concerns of the company, and I am not able to discover sufficient evidence of such a want of care and attention as prudent men in the management of other institutions of a similar kind or in relation to their own concerns are accustomed to bestow.

But, there is a further view to be taken of this case in relation to a particular duty which the directors, or some of them at least, undertook to perform, and wherein, it is strenuously contended, there has not only been a want of ordinary care,

69

and circumspection but gross neglect on their part; and I must confess there is no part of this cause which is burthened with so much difficulty and produces so much embarrassment to the mind as this. I allude to the semi-annual examinations and the failure of the several committees, appointed for the purpose, to discover during three years the depredations which were continually going on. If this was owing to any culpable omission or neglect of the committees, it may present another question: how far the consequences are to be visited upon the other directors? This point, however, has not been raised: the defendants, one and all, putting themselves upon the broad ground of there having been no neglect or omission of duty on the part of any such committees.

In contemplating the magnitude of the depredations upon the funds of the company, the number of them, how often they must have been repeated either by an act of forgery or embezzlement, the boldness and daring of the perpetrator, committing his crimes, as it were, in the very face of those whose interest and duty it was, if possible, to detect and expose him, the mind is naturally startled and astonished at finding he passed the ordeal of each successive committee, not only unharmed but unsuspected of an error or a fault! It is almost incredible to believe he could have escaped, if any of the committees, especially those in the year one thousand eight hundred and twenty-six and on the first day of July one thousand eight hundred and twenty-seven, had gone through their examination with ordinary diligence and care. The subsequent investigations of Mr. McNeal have detected the gross and what would seem to have been the plain and palpable errors and false entries of debit and credit in the books, which must have existed to a certain extent when the examinations took place; and a strong and able argument has been made from thence to show, that the committees could not have examined and compared the different books and entries in the manner they should have done and which their duty prompted and required, otherwise they must have discovered the clue to the frauds and forgeries which had been previously committed.

This argument, however, is not altogether satisfactory; nor is the conclusion to which it leads to be adopted, in opposition to other evidence and against the weight of other considerations which present themselves. When these examining committees proceeded to their task, it is to be remarked that nothing had transpired to awaken the least suspicion in regard to the secretary. He prepared his books for the occasion and made out the usual statements to be laid before the committees; and there can be no doubt of the fact that the whole were artfully contrived to cover his defalcations and to deceive them. And it is also to be borne in mind, that the questions are not whether it was possible for them to detect him and whether they were bound to do so at all events: for nothing was easier of accomplishment or more within the reach of possibility. They had only to go to the bank with the books which he exhibited to them as the note deposit book and the cash deposit book containing entries purporting to have been made by a clerk or teller of the bank, and there ascertain, by comparison or otherwise, the genuineness or correctness of such books or by comparing, in their own office, the cancelled checks, provided they were remaining in the office, with the check book from which they issued; and then the discovery would have been made. It is not, I repeat, what they had it in their power to do, and might have done. There is a wide difference between this and what it was their duty to do. The question simply is, whether those investigations were conducted in the usual manner pursued in other companies by prudent men careful of their own concerns?

That this is the criterion, results from the principles I have already stated; and it has also the sanction of direct authority. In the case of *The Manhattan Bank* v. *Lydig*, 4. J. R. 347, where the question arose as to what was a want of due diligence on the part of the directors in not discovering a fraud and embezzlement committed by a book-keeper in the bank, the Supreme Court used the following language; "The examinations at the bank by the committee of directors were "in the usual way: and the frauds practised eluded detection.

1832.

SCOTT
v.
DEPEYSTER.

1832.

SCOTT

*v.*

DEPEYSTER.

"by the fabrication of a false balance sheet. It is not for
"the court to point out the mode banks are to pursue to detect
"frauds; but if they take the usual and uniform method
"adopted, not only by this but by other banks, they cannot
"be subject to a charge of negligence." Whether the present case will admit of the application of this rule, must depend upon the evidence; and which I shall briefly examine.

In answer to the charges in the bill (and in these respects the statements are clearly responsive and to be received as evidence) the defendants, and those of them who served on the examining committees, speak from their own knowledge, detailing very fully the particular manner in which their examinations were conducted, and they aver that the mode pursued was the same which a vigilant merchant would take in the examination of his own concerns; that they were deceived and imposed upon by books, especially the bill book so called and the note deposit book and cash deposit book of the bank, all of which they have since ascertained must have been forged and false, but of the genuineness of which at the time there was no mistrust or suspicion. They further aver, that such mode of investigation is the same pursued by all the incorporated companies in examining their concerns and the result can only be effected by the most adroit fraud and forgery. The witnesses who testify as to the mode of conducting such examinations in other companies are all gentlemen of great experience and perfectly familiar with the practice. The first is Mr. Walter R. Jones, who has served officially in three different companies and in which he says they pursued very much the same course at the semi-annual examinations described in the answers of the defendants as having been pursued by them. In one of the companies with which he had been connected, they were, indeed, not so particular; in another still less so, and with regard to their bank account, he adds, they relied on the bank book produced by the secretary and such book was also taken as evidence of notes and bills deposited. They never carried their scrutiny so far as to take the bank books to the bank to see if they were forged, but relied on them as

genuine ; and in another place, he says, forgeries in the bank books of the company would be likely to deceive the company the longest time, for the reason that entries in bank books are always relied on as genuine and never questioned. The next witness is Mr. Abraham Ogden, the president of the Ocean Insurance Company, who says, that in his company they never pursued a more strict course, nor did they pursue so strict an one until after frauds were known to have been committed ; and he is not aware a merchant could pursue a stricter course. He also says, it was not the practice in his company to send to the bank to ascertain the correctness of the book exhibited as the bank book, nor in the American Company from one thousand eight hundred and fifteen to one thousand eight hundred and nineteen, although, since frauds have transpired, it has become customary in some companies to do so. Mr. McEvers, the president of the New York Insurance Company, is likewise very explicit on this subject. He says, they always take the bank book as true and they never go to the bank to enquire. Even at the present day (one thousand eight hundred and thirty) in all their examinations they rely on the bank book as true, without sending to the bank to have it certified.

Mr. Richard M. Lawrence, of the Union Insurance Company, corroborates, to the full extent, the testimony of the other witnesses. He says, the mode of examination pursued by the defendants, as described in their answers, is a very complete mode and is a great deal more strict than the one which was pursued by his company before the discovery of the frauds practised by Kane were known ; that it was an examination of extraordinary care when compared with the scrutiny in his company before these frauds ; and, in his opinion, a vigilant merchant would not have pursued a stricter course of examination into his own concerns, no suspicion of fraud or forgery existing. On examinations by committees, he says, the bank books are accepted and relied upon as correct and he has never known them to send to the bank to ascertain whether the entries in such books were true.

All these are witnesses selected by the complainant ; and

1832.

SCOTT

v.

DEPEYSTER.

their testimony in various other respects in relation to the practice of Insurance Companies, the confidence which must necessarily be reposed in the secretary, and the possibility of his practising frauds and forgeries to a great extent and avoiding detection for a length of time, without any remissness on the part of the president or directors, tend to exonerate the defendants in this instance from the imputation of carelessness.

Nor do I find in the testimony of the other witnesses, who may be considered of another class—coming principally from Fire Insurance Companies and who speak of the practice of their offices—any thing to lessen the force of the evidence to which I have just adverted. According to that evidence, the proceedings of the examining committees, however unfortunate in their results and however strange it may appear that they did not elicit the true though lamentable condition of the finances of the company, were nevertheless conducted with ordinary care at least and in the method usually pursued on such occasions. The defendants are, therefore, exonerated from the charge of negligence on this score.

I have now gone through this case ; and have touched upon all the points which appeared to me deserving of consideration.

Some portion of what I have here expressed might have been spared, particularly what relates to the construction of the charter of the company and the unauthorized manner of investing and employing their capital. The consideration of these topics may be deemed immaterial to the conclusion which I have formed ; but, as the subject of the charter was introduced and fully discussed, I deemed it not improper to give my views of it which, if correct, may perhaps be of some service.

Upon the whole case, both in regard to the law and the evidence, and after a very laborious and careful examination, I find myself forced to the conclusion, that, upon none of the grounds which have been assumed and in no point of view are the defendants to be charged with the heavy loss sought to be fastened upon them.

I must dismiss the bill, with costs.