## Blossom and others *against* Griffin and another.

The liability of a common carrier attaches when the property is deposited with him for transportation.

And where a party who is both a carrier and a warehouseman receives goods into his warehouse to be transported by him, his responsibility, as a carrier, commences when they are received.[1]

In construing a written instrument, the court may look to antecedent and surrounding facts and circumstances to ascertain its meaning.

And where parties, who were doing business as forwarders and also as carriers, agreed orally to transport merchandise, to be delivered to them from time to time, and subsequently, on receiving a portion thereof to be transported pursuant to the contract, they executed an instrument stating that the same was received *to be forwarded; Held*, that they were responsible as carriers and not as forwarders.

---

[1] *Marshall* v. *New York Central Railroad Co.*, 5 Alb. L. J. 74; s. c. 45 Barb. 502. *Wade* v. *Wheeler*, 3 Lans. 201; s. c. 47 N. Y. 658. *O'Neill* v. *New York Central Railroad Co.*, 60 N. Y. 138.

ACTION against the defendants as common carriers to recover damages caused to merchandise by an accidental fire. The case was heard before a referee, who ordered judgment in favor of the plaintiffs. This judgment was affirmed by the supreme court sitting in the 8th district. The defendants appealed to this court. The following facts were found by the referee: In 1851 the plaintiffs and one Clexton composed the firm of Gorton & Co., which was engaged at Black Rock dam, near Buffalo, in the manufacture of cassimeres and jeans; and during that season the defendants were forwarders and werehousemen at Buffalo, and were also common carriers of property on the Erie canal. In the spring of the year 1851, the defendants made an oral agreement with Gorton & Co. to transport their goods to New-York and to bring merchandise for them from New-York at the price of forty cents per hundred. Under and in pursuance of this agreement, Gorton & Co., from time to time prior to the 3d of July, delivered goods to the defendants at their warehouse in Buffalo, and also on board canal boats in the canal at Black Rock, near the plaintiffs' factory, to be transported to New-York. The defendants sent the boats to Black Rock to receive the goods, on being notified by Gorton & Co. that they were ready to be shipped, and the goods delivered at the warehouse in Buffalo were delivered there at the request of the defendants, because they could not calculate the storage-room in the boats. On the 3d of July, between four and seven o'clock, P. M., Gorton & Co., by their agent, delivered at the store-house of the defendants, in Buffalo, five cases of goods, marked McCurdy, Aldrich & Spencer, New-York. which were received by the servant of the defendants and placed in the store-house. Gorton & Co. sent with the goods an instrument, which they directed their agent to have signed by the defendants on the delivery of the goods to them, and the same was signed by the defendants at the

time the goods were received by them. This instrument is as follows:

"Received, Buffalo, July 3d, 1851, from Job Gorton & Co., five cases domestic goods, marked McCurdy, Aldrich & Spencer, New-York, *to be forwarded.*

(signed)     JNO. M. GRIFFIN, & Co.,<br/>per MOORE.

McCurdy, Aldrich & Spencer were the agents of Gorton & Co. for the sale of their goods in New-York, and the goods were shipped to them for this purpose.

The referee found, as matter of fact, that the goods mentioned in this instrument were delivered to the defendants under and in pursuance of the oral agreement made the previous spring, and received by them as common carriers. It also appeared that the forty cents per hundred pounds covered the charges of the defendants for storage, shipping and freight. On the night of the 3d of July the storehouse of the defendants was accidentally burned and the goods in question partially destroyed by the fire, without any fault or negligence on the part of the defendants. Afterwards Clexton sold and transferred his interest in the demand to his copartners, the plaintiffs, but this transfer was not made for the purpose of enabling Clexton to be a witness.

The referee decided that the defendants were liable as common carriers, and ordered judgment against them for the damage to the goods, being $1167.72, and the defendants excepted.

*John L. Talcott*, for the appellants.

I. The defendants received the goods in question, as forwarders and warehousemen. The written contract on that subject was conclusive, so far as that receipt was a contract setting forth the obligations the signers took upon themselves in regard to the goods received, and it was not open

to be varied or contradicted, even by express parol evidence that the contract in regard to these goods was different. (*La Farge* v. *Rickert*, 5 *Wend.*, 187; *Crary* v. *Holly*, 14 *Wend.*, 26; *Egleston* v. *Knickerbacker*, 6 *Barb.*, 458; *Coon* v. *Knapp*, *Selden's Notes*, July, 1853, *p.* 26; *Sheldon* v. *Peck*, 13 *Barb.*, 317; *Lincoln* v. *Crandell*, 21 *Wend.*, 101.) All prior negotiations resting in parol are merged. But in this case the prior acts proved, even if admissible, do not contradict the written contract in regard to these goods.

II. The defendants, having received the goods in question as forwarders, are not liable for the damages occasioned by an inevitable accident. (*Roberts* v. *Turner*, 12 *J. R.*, 332; *Platt* v. *Hibbard*, 7 *Cowen*, 497; *Brown* v. *Dennison*, 2 *Wend.*, 593; *Knapp* v. *Curtis*, 9 *Wend.*, 60; *Story on Bailment*, §§ 535–537; *Angell on Carriers*, § 75.)

*J. L. Curtenius*, for the respondents.

Comstock, J.   The goods in question were delivered to the defendants on the 3d of July, and during that night were burned without fault or negligence on their part. If at that time they were liable as forwarders only, they are not responsible for the loss. If, on the other hand, their liability as carriers had attached, then they must pay for the goods; and this is the question to be determined.

The defendants were both carriers and warehousemen. In such a case it is well settled that if the deposit of the goods in the warehouse is a mere accessory to the carriage, in other words, if they are deposited for the purpose of being carried without further orders, the responsibility of the carrier begins from the time they are received. (*Angell on Carriers*, §§ 75, 131.) So of an inkeeper who is also a carrier by land; if he receives goods into his inn to be carried, he is liable as a carrier for any loss which may happen before they are put in transit. (*Angell on Carriers*, § 133; *Hyde* v. *Trent and Mersey Nav. Co.*, 5 *T. R.*, 389.)

In this case it appears that the plaintiffs were in the habit of sending their goods from Buffalo to New-York, to be sold by their consignees. In the spring before the fire happened they had agreed with the defendants to be their carriers, at a price which included both freight and warehouse charges; and under this agreement the defendants, from time to time, received goods from the plaintiffs at their store-house and carried them through to New-York. The referee has also found, as matter of fact, that the goods in question were received under this agreement. They were therefore received for transportation, and, within the principle which has been stated, were there nothing else in the case, it would be very plain that the defendants became liable as common carriers.

It has been urged, however, that the receipt which the plaintiffs took from the defendants on delivering the goods, declaring that they were received to be forwarded to the consignees, is conclusive against any theory of liability as carriers. The objection, I think, cannot prevail. It may be granted that the writing is more than a mere receipt; that it imports an agreement, and is therefore within the rule which excludes parol evidence where contracts are reduced to writing. But the rule itself is not quite so broad as the terms in which it is commonly stated would seem to imply. It only excludes any other evidence of the *language* used by the parties in *making the contract* than that which is furnished by the instrument itself. (1 *Greenl. Ev.*, 316, 321.) It excludes the *colloquium* or oral negociation leading to the very contract which the parties consummate by reducing it to writing; but it does not reject an antecedent parol agreement of a different character and imposing a very different but not inconsistent obligation. The defendants, as before stated, were carriers, and as such they were under a parol agreement to carry the plaintiffs' goods generally, and those in question in particular. Their store-house was the place where they were in the habit of receiving

goods for that purpose, and where their liability as carriers commenced. Now, although we concede that, looking at the receipt only, the goods were taken in to be forwarded in the strict and technical sense of the term, yet the defendants, in virtue of the antecedent agreement, were to take them from the store-house as carriers and transport them to New-York. Keeping in view, then, the rule already stated, their liability as carriers at once attached. Unless it can be shown, therefore, that a forwarder's receipt cancels or in some way swallows up his antecedent agreement to take the same goods as a carrier, whether the latter engagement be by parol or in writing, the defence must fail; and I think that cannot be shown.

But the receipt itself, in my opinion, admits of a different interpretation from that which has been thus far conceded. In construing this, as every other writing, it is proper to look at all the surrounding circumstances, the preëxisting relation between the parties, and then to see what they mean when they speak. If no facts had been shown outside of the receipt itself, it might and probably would have imported simply an obligation to deliver the goods to some safe and responsible carrier, to be transported to their destination. But calling in the aid of all the circumstances, viewing the defendants also as carriers, and looking at their existing obligation to the plaintiffs, a fair exposition of the language used is that the property was to be "forwarded," not in the exact and technical sense which excludes the idea of transportation, but to be carried forward to its destination, as marked on the goods and expressed in the receipt, by their own line of conveyance, according to their antecedent agreement. There is no rule which requires the words of a contract to be construed in their technical sense. In general the rule is the reverse (1 *Greenl. Ev.*, 317), and there is certainly no necessary meaning of the phrase, "to forward," which excludes the interpretation suggested. There can be no doubt that this was what the parties

intended, and I am quite clear that in adopting such a con-struction, we do no violence to the language in which they expressed themselves.

The judgment should be affirmed.

T. A. JOHNSON, J. The writing given by the defendants, on receiving the goods in question, on its face, and without any evidence in regard to the business in which they were engaged, would not, certainly and unequivocally, amount to anything more than a mere receipt for the goods. The terms, *to be forwarded*, would not in that case necessarily import an undertaking, on their part, either *to send or carry* the goods to any place for the persons who delivered them. It became necessary, therefore, in order to enable the court to determine the true import of these terms in the connection in which they were used, and to ascertain what the parties intended by them, to show in what busi-ness they were engaged, and to what subject matter the writing applied, to prove some extrinsic facts. Had nothing been shown beyond the facts that the plaintiffs were manu-facturers of goods of that description, for sale in the usual course of trade, and that the defendants were warehousemen and forwarders, the writing would undoubtedly, in the light of such facts alone, be held to import clearly an undertaking, on the part of the defendants, to deliver the goods at the earliest opportunity to some trusty and responsible carriers, who should engage on the usual terms to carry and deliver them, at the place of destination, to the persons to whom they were addressed or consigned. In such a case it is clear that the defendants could not be held liable for any damage or loss happening in the manner the loss in question is found to have happened. But whenever it becomes necessary for the court, in order to interpret an instrument, to resort to proof of extrinsic facts at all, it ought to hear all the facts and circumstances legitimately bearing upon the subject to which the instrument relates. It should

then surround itself with all the material facts and circumstances which surround the parties at the time, and occupy, as nearly as possible, their position. Hence proof of the other facts connected with this transaction became not only important, but absolutely necessary, to enable the court to perform its duty of interpreting the writing, and determining the true intent and meaning of the terms employed. And when the additional facts came to be established, that this was not an isolated transaction between the same parties—that the defendants, in addition to being warehousemen and forwarders, were common carriers also—that in the spring, previous to the loss in question, they had agreed with the firm of which the plaintiffs are members and assignees to carry their goods to and from New-York at a specified price per hundred, and that they had from time to time, before this, received goods of said firm at their warehouse, where the goods in question were delivered, to be carried under the general arrangement—it became apparent that the writing was not necessarily a distinct and independent agreement, in reference to this particular parcel of goods, by which the defendants were to act as forwarders merely. In the light of all these facts and circumstances, the terms "to be forwarded," instead of importing an absolute and unqualified undertaking on the part of the defendants to deliver the goods to some carriers who should undertake to transport them, amount merely to an acknowledgment of the purpose for which the goods had been delivered by the owners, that is, to be forwarded or carried by the defendants themselves, under the existing arrangement. Such is the natural and reasonable import of the terms employed, in view of all the surrounding facts and circumstances. The writing is not a new undertaking, changing preëxisting relations, but mere evidence that the parties were carrying out and performing the prior agreement, which embraced all the necessary terms and conditions. The goods having been delivered to the

Ford *against* Williams.

defendants to be forwarded or carried by them under their prior agreement immediately on the first opportunity, without farther orders from the owners, they became responsible, as carriers, the moment the goods came fully into their possession, and are consequently liable for the loss in question. (*Angell on Carriers*, §§ 75, 131, 134; *Story on Bailments*, § 536; *Edwards on Bailments*, 446, 447, 448, 449.)

The admission of evidence of extrinsic facts upon the trial, and the application of the facts established to the instrument, by way of interpretation, were in no respect in conflict with the rule which forbids the introduction of parol evidence to contradict or vary written instruments.

The judgment of the supreme court should therefore be affirmed.

DENIO, C. J., A. S. JOHNSON, SELDEN and HUBBARD, JJ., were also for affirmance; MITCHELL, J., was for reversal. WRIGHT, J., did not hear the case argued and took no part in the decision.

Judgment affirmed