'Wright, J.
 

 The evidence would, have justified the jury in finding that about the 5th of January, 1853, Gold, who had acted as assistant book-keeper in the Rochester City Bank for two years previously, embezzled! the sum of $1,000 of its funds; and made false and fraudulent entries in the hooks of the bank, with the view and for the purpose of concealing from observation and detection such embezzlement, until he could place the property beyond1 the- reach of reclamation. In March,. 1851, the defendant Elwood obligated himself to the-plaintiff, as the surety of Gold, that the latter should- faithfully discharge the trust reposed in him-as-an assistant book-keeper of. the bank. The single question is, whether the embezzling of the funds by Gold, under cover of false entries in- the- books of the hank, was a breach of the undertaking of' the- surety.
 

 It is important to ascertain- the nature and extent of the engagement of the surety as indicated. by the written contract.
 
 *90
 
 Though, the rule of strict construction in favor of a surety excludes implied engagements, and calls for exact performance of express stipulatipns, it has no application to the construction of .the written undertaking. In this respect, there is no difference between the contract of a surety and that of any other party. ' The instrument in this case by which the parties .become bound, is to be construed, no less as to the surety than the principal, with reference to the situation of the parties, and the hazards against which the plaintiff exacted security, as a condition to introducing an employee into the bank.
 

 The language of the instrument is peculiar. It recites that Gold has been appointed assistant book-keeper of the Rochester City Bank, and the engagement of principal and surety follows, that he “shall faithfully discharge the
 
 trust
 
 reposed in him .as such assistant book-keeper as aforesaid.” How, within the intention of the parties, was this simply an undertaking that Gold would keep, witk reasonable skill and care, such books of the bank as he might properly be required to keep as assistant book-keeper, and nothing more? If it was, then not only the surety but the principal, would be absolved from liability on the undertaking, even though the latter, availing himself of the facilities afforded by his fiduciary position, should defraud the bank or suffer it to be defrauded. If Gold, taking advantage of the opportunities which his position afforded him as an employee of the bank, should himself abstract, or permit others to abstract the funds or property of the bank, his act would not fall within the scope of his or-his surety’s contract provided they only intended by such contract to vouch for his care and skillfulness as a book-keeper, and not for his honesty or fidelity to his trust as an employee of the bank. I do not think the undertaking can be so read or construed. I agree that the surety cannot be holden beyond the fair scope of his engagement as -intended by the parties when undertaken; but the-question is what'was this intention, as expressed in the instrument, construed in the light of the circumstances surrounding its execution. Gold had been selected for a post in a banking institution which brought him, into close and constant
 
 *91
 
 proximity with its money and. property. His place was behind the counter of the institution, and, practically, he had nearly the opportunity of the cashier or teller to embezzle the funds of the corporation, and a better one to conceal such embezzlement, and prevent its immediate detection. The receiving and paying out of the money of the bank was done by the cashier or teller, but it was not their duty to keep constant and exclusive watch over it. The temptations to purloin money constantly beset those employees of a bank who are directly within reach of it. These things are presumed,to have been known to the parties: and under the circumstances the defendant Elwood guarantees that the appointee shall faithfully discharge a trust, as one of its employees, reposed in him by the bank. How, can it fairly be said that the parties only contemplated, and Elwood only intended, a guaranty that Gold should keep the books of the bank correctly, and that if a loss ensued from a default in this respect he would respond to the extent of such loss ? I think not. It will not be pretended that this was all the obligation intended, and resting upon Gold by virtue of the contract; and the obligation assumed by the surety was coextensive with that of the principal. The bond exacted was in the penal sum of $5,000, and it is scarcely supposable that, in the contemplation of the parties, it was merely intended to indemnify the bank against injuries resulting from Gold’s unskillfulness or negligence as a book-keeper, and not against his dishonesty or infidelity to his trust as an employee of the bank. It seems to me that, to carry out the intent of the parties, the instrument should be construed as an absolute engagement of the defendant for the integrity and fidelity'of his principal in the discharge of the trust reposed in him as an assistant bookkeeper in the bank. The contract did not define the trust reposed, but .indicated the-department of duty to be assigned, and guaranteed that the appointee was a trustworthy person to be introduced into the bank -to discharge that duty. Its obvious intention was to vouch for his honesty and fidelity to his trust as an employee of the bank. I am aware that it was decided in Virginia, by a divided court, in the case of
 
 Allison
 
 v.
 
 Farmers'
 
 
 *92
 

 Bank
 
 (6 Rand., 204), that a bond similar to the one in question did not cover the felonious taking of money by a book-keeper from" the drawer of a bank. I do not think the case ought to be followed, or its principle extended by applying it to the present case. The conclusion is reached by a majority of the court that the surety, when he signed the bond, did not intend to bind himself that his principal should not- commit a felony. By a like mode of reasoning a like conclusion might be reached in the case of a cashier or teller, who, after receiving ,and duly depositing the money of the bank in its drawers, should steal it, and the like question might- be asked, whether his surety ' intended to bind himself that his principal should not steal. “ Say,” said one of the judges, “he would be bound to discover such felony and fraud in another; no one is bound to accuse himself of a felony, nor can the condition of this bond be construed to bind him to do so, or that the bond shall be forfeited if he does not. Even if it was a bond
 
 expressly
 
 that he should not commit any felony in the bank, he would not be bound to discover it on himself. The concealment [by subsequent false entries] was a mere
 
 non-discovery
 
 of a felony.” If the principles upon which this case was decided are to be imported into our law, I see not why every teller may not make false entries and every book-keeper abstract funds at pleasure, being exonerated from liability on their respective bonds by transcending the limits of the trust reposed. The doctrines put forth in the majority opinions would substantially cancel all official bonds for the safe keeping of corporate or public funds.
 

 The plaintiff was nonsuited at the circuit on the ground that Gold was acting as teller, and not as assistant book-keeper, in making the false entries in the Credit Journal; and the decision was affirmed on the grounds, 1st. That the wrongful taking of the plaintiff’s money by Gold was no breach of the bond of the surety, as he had covenanted only that Gold would faithfully discharge the duties of an assistant bookkeeper ; and 2d. Though the making of the false entries on the books of the.bank might technically sustain the action; yet as no loss resulted as a consequence of those entries, the
 
 *93
 
 plaintiff would be only entitled to nominal damages, and a new trial should not be granted for that purpose. I think, an erroneous construction was put on the undertaking of the surety, both at the circuit and general term.
 

 It appeared in evidence on the trial, that up to December, 1851, the teller of the bank had kept the book called the Credit Journal, in which was daily entered, from slips, the amount of cash and deposits received. In December, 1851, the cashier-of the bank requested Gold to take charge of and keep this book. He did so, and kept it exclusively for thirteen months prior to the transaction out of which this litigation arises. The defendant’s counsel claims primarily that (conceding Gold made false entries for a fraudulent purpose in this Credit Journal), there was no breach of the bond established, as the entries were made as assistant teller, and not as assistant book-keeper, and for Gold’s acts in that capacity Elwood is not responsible. Within the narrowest construction of the bond, this position cannot be maintained. Conceding that the surety covenanted that Gold should do his duty as an assistant book-keeper merely, making entries in the Credit Journal was book-keeping, and was within the range of the class of duties that might be appropriately assigned to an assistant book-keeper. The teller, it is true, kept this book for some months after Gold went into the .bank; and in doing so, it might be more appropriately said that he was acting as assistant book-keeper. We are not informed what books were assigned to Gold to keep when he entered the bank; but is not the idea an absurd one that the managers "of the bank could not assign to him the keeping of another book without releasing the surety from his obligation ? In keeping the Credit Journal, Gold had nothing to do with receiving and counting the cash. All that he did was to make entries in the journal of cash receipts from slips furnished by the cashier or teller. He had nothing to do with receiving money, and he was no better able to abstract it from the drawers or vault of the bank than though he had been confined to making entries in the ledger or other books of the corporation. Ah that can be said is, that being disposed to embezzle the
 
 *94
 
 money of his employers, he was bettér able to cover up the wrongful act by falsifying their books, and thus temporarily avoiding detection.
 

 It is conceded that unless the position stated be tenable, the false entries by Gold in the Credit Journal, and the error or alteration in the- ledger account of the depositor, amounted to a technical breach of the condition of the bond. But if my construction of the instrument be correct, that the surety undertook for more than the faithful discharge of the mere duties of a book-keeper, there was something beyond a technical breach. I cannot doubt that the covenant that Gold should
 
 “faithfully
 
 discharge the trust reposed in him as assistant book-keeper,” included within its scope and intention an engagement that the ¿mployee would not transcend the limits of the trust reposed, in availing himself of his position to misapply or embezzle the funds of his employer. There has not been a faithful discharge of the trust reposed in a book-keeper of a bank, who transcends the limits of and abuses his trust, and loss thereby accrues to his employers. In
 
 Barrington
 
 v.
 
 Bank of Washington
 
 (14 Serg. and Rawle, 405), it was held that the sureties in the official 'bond of the cashier of a bank, conditioned that he would well and truly perform the duties of cashier to the best of his ability, not only undertook for the fidelity and honesty of the principal, but also that he.should perform the duties with competent skill and ability, and if he transcended the known powers of the cashier, by changing the securities of the bank without their knowledge, and loss accrued by the abuse of his trust, the sureties were answerable for the loss: I think, also, where a person is introduced into ' and employed by a bank to assist in keeping its books, and avails himself of his situation to defraud his employers, the surety who has vouched for his honesty, and engaged that he will be faithful in every way to the "trust reposed in him, should answer for any loss accruing from his fraudulent or criminal conduct. Irrespective, therefore, of false entries, the abstraction of the money in this case by Gold would render the surety liable for the loss. But more especially would he be liable if the false entries were
 
 *95
 
 concurrent and simultaneous, and each a part of the
 
 res gesice
 
 of guilt. There can be no doubt that the surety would have' ' been liable for the loss, if Gold, by mating the false entries, had enabled a confederate to take .the money undetected; and the principal and surety cannot evade this liability by the former taking the money himself. It would be no defence to Gold (and the obligations of surety and principal on the bond are coextensive), that the false entries were made for the sole purpose of enabling him to embezzle the'money undetected, and remove it to a place of security, and that he thereby accomplished such object. He is using a means which his agency puts in his hands to successfully consummate a wrong towards his employer. The evident purpose 'of the false entries was to shield the culprit and prevent the money from being reclaimed. The taking and entries were one transaction, and it seems to me it can hardly be properly contended that the ultimate loss of the money by the bank was in no degree attributable to the false entries and Gold’s abuse of his trust as book-keeper. It is true, the loss' to the bank was not wholly consequent upon the act of falsifying its books; but such falsification was parcel of the wrongful act of Gold by which a loss ultimately accrued to the bank.
 

 These views lead to the reversal of the judgment, and the ordering of a new trial.
 

 All the judges (except Seldeh, J., who took no part in the decision) concurring,
 

 Judgment reversed, and new trial ordered