Ingalls, J.
—We have carefully examined this case, and have reached the conclusion that the decision is correct in regard to the merits, and is sustained by the law applicable thereto.
The opinion of the learned referee indicates a thorough examination of the case, and his discussion of the questions involved is so full that nothing further need be added. The judgment should be affirmed, with costs.
Learned, P. J., and Landon, J., concur.
The following is the opinion of the referee:
James L. Smith,
Referee — The defendant, by their contract, dated the 14th of June, 1880, engaged _ that the First Rational Bank of Auburn would perform its agreement, made on the same day, with the state, to_ pay on demand such moneys as the state should deposit with it under such agreement. By such agreement, after reciting that whereas “certain moneys” of the state “have been and are proposed to be deposited ” in said bank, by the agent and war *447 den of Auburn Prison for safe keeping and for interest, the bank promised to pay such deposits on demand, with interest-on daily balances at the rate of three per cent.
For many years next preceding the making of the agreement, the bank had been a depositary of moneys received by it from the agent and warden of the prison on each alternate week during the early part of the time and for each alternate month during the latter part, the National Exchange Bank of Auburn having received similar deposits during the alternate weeks and months of such period, and that arrangement as to alternation continued after the agreement in question was made and as long as the First National Bank did business.
The deposits which the bank received during the period preceding the making of the agreement, and the deposits ■ which it then held were composed, in the main, of contract-earnings, with some small additions consisting of moneys placed by individual convicts with the agent and warden for safe keeping or the proceeds of the sale of refuse from the prison. No part of such deposits, during that period, came from the avails of the sale of merchandise manufactured on state account.
In 1884 an act was passed inhibiting the superintendent of the state prisons from contracting for the employment of convicts in the prisons (Laws 1884, chapter 21), and the act was followed the next year by an appropriation of $500,000 for certain enumerated, purposes connected with the prisons, including “material and expenses of manufacturing.” (Laws 1885, chapter 70). Thereafter the convicts were employed in manufacting on" state account, and the sale of the articles so manufactured resulted in a large increase of the sums received by the agent and warden of the Auburn Prison and by him deposited from time to time in the First National Bank.
The moneys in respect to which the bank made default were mostly derived from the latter source, and to that extent, the defendants insist that they are not liable, their contention being that deposits of money derived from the new system of prison labor are not within their undertaking. Their contention rests mainly upon the meaning and effect of the words above referred to contained in the recital in the agreement of the bank. Those words, they argue, limit their liability to deposits of money received at the prison under the system of labor existing prior to, and at the time of making the agreement, and do not include the increased deposits of money realized from the sale of articles manufactured on state account.
_ While a surety or guarantor has the right to insist that his liability shall not be extended beyond the precise terms of his contract, yet in ascertaining the meaning of the language used, the same rules of construction are applica *448 ble to contracts of suretyship as to other contracts. The apparent intention of the parties is to control, and if the language is ambiguous or needs interpretation, the surrounding circumstances .may be looked at to ascertain the intent.
Testing the agreement by these rules, I do not think the contention of the defendant can be maintained. The guaranty is as broad as the undertaking of the bank, and that, it seems to me, was intended to cover all moneys that should come to the hands of the agent and warden of the prison, as such, and be deposited by him.
The object of the bank in making the arrangement, was to secure the deposits to itself. That the bank sought the deposits and regarded them' as a source of profit appears from the fact that it agreed to pay interest upon them; and that the defendants were of the same mind, is shown by the fact that they recited the making of such deposits as one of the considerations of their guaranty. These features of the transaction repel the idea that either the bank or its guarantors intended to restrict the amount of the deposits or to limit the source from which' the prison was to derive them. The larger the deposits, the greater would be the expected profits of the bank. The words of the recital were not intended as a limitation of the source or amount of the moneys which the agent and warden was to deposit; they had no other object than to refer to the fact that the state had previously made the bank its depositary of prison moneys, and that the intention was to continue that relation.
It was the duty of the comptroller, by statute, to require a bond, subject to his approval (Laws 1860, chap. 399, § 8) and impliedly, he had the authority, and it was his duty, to require a new bond from any depositary, whenever he deemed it necessary. The same statute constituted the agent and warden the fiscal officer of the prison of which he had charge and made it his duty to deposit all moneys received by him, once in each week to the credit of the treasurer of the state, in a bank located in the city or village “ most adjacent to the prison.’’
The act of 1884 did not authorize the introduction of a new system of prison labor. An earlier statute, which was in force when the guaranty was entered into, provided that the system of labor in the state prisons should "be by contract or by the state, or partly by one system and partly by the other, in the discretion of the superintendent. Laws 1877, chap. 107, § 6. The act of 1884 only prohibited the superintendent from further continuing the -contract system.
In ascertaining the intention of the defendants, it is to *449 he presumed that they had in view the statutory provisions above referred to making it the duty of the agent and warden to deposit all moneys received by him, and vesting the superintendent with authority to adopt the state account system of convict labor in his discretion, and that they intended to be bound, whichever authorized system of labor might be employed and whatever might be the amount of moneys received and deposited by the agent and warden, reserving to themselves the right to terminate their liability at any time on giving ten days notice.
Another alleged ground of defense is, that the liability of the defendants did not extend beyond the life of the ■charter, under which the bank had existence at the time when the guaranty was made.
The charter expired on the 23d day of February, 1883. Thereafter it was renewed by the comptroller of the currency, in pursuance of the provisions of the act of congress, approved 12th day of July, 1882, to enable national banking associations to extend their corporate existence. The ■certificate of the comptroller bears date the 24th of February 1883, and was based upon a certificate of the officers of the bank, in due form, dated the 16th of January, 1883, ■containing a consent in writing to the extension of the charter for twenty years, signed by stockholders owning not less than two-thirds of the capital stock of the bank, among whom was each of the defendants. The name of the corporation was not changed, and it continued its business under the renewed charter, without interruption.
A large share of the deposits, respecting which the plaintiff seeks to hold the defendants in this action, was made after the renewal of the charter, and the defendants ■claim that as to such portion, they are not liable. That ■contention, also., I think fails. The corporation remained the same, hot only in name, but in fact. It was one and the same body. It continued its business generally, and its ■dealings with the state precisely as it had done before. Each of the defendants was not only a stockholder but a director at the time of the execution of the guaranty, and during the «entire period of the reception of the deposits in question, both before and after the renewal of the charter. As directors, the defendants are presumed to have had knowledge ■of the transactions of the bank. By the terms of their guaranty they had the right to terminate their liability by giving notice. In these circumstances, their silence and inaction imply an assent on their part to the continued receipt by the bank of the deposits made by the warden. If the guaranty of these directors had been given to a private individual to induce him to deposit his funds in the bank, *450 and he had continued to do so on the faith of the guaranty, after the renewal of the charter, it will hardly be contended that the defense under consideration would have availed against him.
It is immaterial that the defendants acted in their private capacity, and not as as directors, in executing the guaranty. Whatever knowledge a director has or ought to have officially, he has or will be conclusively presumed at law to-have as a private individual. Thus, a director is affected with notice of the conditions and transactions of the bank. Morse on Banking, 131, et seq.
Irrespective of the official relation to the bank which the-defendants held, and of their implied assent in its action, I think it is a complete answer to the defense under consideration that the bank was the same entity before and after the extension of its charter. In the case of The City National Bank of Poughkeepsie v. Phelps (16 Hun, 158; S. C., 97 N. Y., 44), the City Bank of Poughkeepsie, a state corporation, became a national bank under the name by which it brought suit. The action was upon an instrument by which the defendants in the action guaranteed to the state bank the payment of any sum not exceeding $5,000, which one Woodruff might secure of the bank for legitimate business' purposes. It was held, not only that the guaranty was a continuing one, and that the identity of the bank was not so changed as to terminate the guaranty;, but also, that the City National Bank could continue to advance upon the guaranty and enforce it. 97 N. Y., 50. That case was a much stronger one for the defense than is this. There, was a change of name; here, there is none.. There, the guaranty was given to the bank by persons in no way connected with it, to induce it to lend its-money. Here, the guaranty is given for the bank by some of its stockholders and directors to induce the state to deposit its money in the bank. There, the new organization was under federal instead of state authority, and to some extent clothed with new powers and subjected to new liabilities. If the change of name and organization did not-release the sureties in that case, the conclusion is hardly warranted that the defendants here did not continue liable upon their guaranty after the charter of the bank was renewed with their assent and participation.
Several cases are cited by the defendant’s counsel. They are Thompson v. Young (2 Ohio, 334); Union Bank v. Ridgely (1 Har. & Gil., 324); Grocers Bank v. Kingman (16 Gray, 473); Bank of Washington v. Barrington (2 Pen. & Watts., 27); Brown v. Lartimore (17 Cal., 93). Each of them, except the last, is the case of sureties upon the bond, of a cashier or other officer or employee of a bank or other *451 ■corporation, given to the employer, for its benefit or protection. The sureties in each case were in no way connected with the corporation, and were not shown to have kñowledge of its affairs, actual or implied. In three of the cases the charter of the bank expired and was renewed before the alleged defalcation occurred, and in one of them the capital stock of the bank was increased. It did not appear that the sureties had knowledge of the renewal of the ■charter or the increase of the stock. In the California Case, the legislature extended the term of a county treasurer, who afterwards defaulted, and it was held that the sureties in his official bond were not liable The considerations already stated show the distinction between those cases and this.
The case of The Exeter Bank v. Rogers and ano. (7 N. H., 21) seems to be in conflict with the cases above referred to, except the last. There, the charter of a bank incorporated in 1803 for twenty years, was renewed for a like term from 1st January, 1824. A cashier of the bank, appointed in 1809, gave bond with sureties for faithful performance, ■etc., and continued cashier till 1830. It was held that the bond covered the whole time while he remained in office.
If either of the defenses above considered is good, then not only are "the defendants released from .their guaranty, but from aught I see the bank also is absolved from liability under its agreement. Rochester City Bank v. Ellwood, 21 N. Y., 88, 90; People v. Vilas, 36 id., 459, 461.
The bond or agreement executed by the bank, although not official, partakes, in many respects of the character of an ■official bond. It is executed to the state by a depositary of public moneys, selected by a state official, pursuant to law.. It has been held, in numerous cases, that an official bond, ■conditioned for the discharge of the duties of the office, is not restricted to the duties prescribed by law at the time of the giving of the bond, but embraces the duties of the office as fixed and regulated by the legislature, from time to time.
In People v. Vilas (supra) it was said by Grover, J., that “any alteration, addition or diminution of the duties of a public officer made by the legislature, does not discharge his official bond or the sureties thereon so long as the duties required are the appropriate functions of the particular officer, and that all such alterations are within the contemplation of the parties executing the bond.” Board of Supervisors v. Clarke, 92 N. Y., 391; Board of Education v. Quick, 99 id., 138.
Even if a new system of labor had been introduced into the prison by the action of the legislature, after the execution of the bond and guaranty, leading to a large increase *452 of the prison receipts and deposits, the case, apparently,, would have been within the reason of the rule pertaining to official bonds, but as no such action was had by the legislature, it is not necessary to test the case on that-ground.
The cases relating to official bonds do touch this controversy, however, so far as they authorize the proposition that the statutes in force respecting the duty of the warden in depositing money and the authority of ■ the superintendent in respect to systems of labor in the prisons, were in the contemplation of the parties executing the agreement and the guaranty.
The amount of deposits in the bank when it made default, is shown to have been the sum of $66,404.27. From this is to be deducted a dividend paid by the receiver of the bank, amounting to $16,601.06, leaving a balance of $49,-803.21, for which sum last mentioned, with interest at the contract rate on the principal, both before and after such payment, the plaintiffs are entitled to judgment.