(17 Misc. Rep. 202)

### LATTIMER et al. v. BUXTON et al.

(Supreme Court, Special Term, New York County.   May, 1896.)

CONTRACTS—INTERPRETATION.

   Defendant and other officers of a savings bank, acting in concert, embezzled funds of the bank.   On discovery of the embezzlement, but before the exact amount was ascertained, the defendant repaid a sum which he claimed was the amount taken by him; and he entered into a contract reciting that it was claimed that he was indebted to the bank in an amount

not then determined, and that, if any indebtedness should be found to exist, defendant would pay the same. *Held*, that by such agreement defendant bound himself to pay the amount embezzled by the other officers.

Action by G. Byron Lattimer and the Irving Savings Institution against William H. Buxton and others to foreclose a mortgage. Judgment for plaintiffs.

Stern & Rushmore, for plaintiffs.
Frederick A. Camp and Rollins & McGrath, for defendants.

SMYTH, J. This action was brought to foreclose a mortgage given to secure the performance of an agreement, which agreement is in the following words:

"Agreement entered into this fourth day of May, 1893, by and between William H. Buxton, of the city of New York, party of the first part, and Bainbridge Colby, party of the second part, witnesseth:

"Whereas, the party of the first part is, and for some time past has been, the secretary of the Irving Savings Institution, a corporation organized under the laws of the state of New York, and it is claimed by the said institution, or some of the officers thereof, that said party of the first part is indebted to it for a large amount of money, which indebtedness, if any, was created under circumstances not herein set forth, but which may be shown if this agreement is ever sued upon in a court of law or equity; and whereas, the exact amount of such indebtedness, if any, has not been yet determined, but is about to be investigated and fixed, and, if any be found to exist, said party of the first part is to pay the same, and in the meantime desires and has agreed to secure the payment thereof by mortgage upon certain real estate owned by him; and whereas, the said savings institution has appointed the party of the second part to act for and represent it in this agreement, and the party of the first part hereby recognizes the party of the second part in such capacity: Now, therefore, in consideration of the premises and of the sum of one dollar to him in hand paid, and of other good and valuable considerations, receipt whereof is hereby acknowledged, the party of the first part covenants and agrees to and with the party of the second part as follows: First. That after an examination and investigation of his accounts and dealings with said Irving Savings Institution there shall be found to be any indebtedness from said party of the first part to said institution, he will pay the same, with lawful interest thereon, on demand. Second. That the said institution shall have twelve months from the date hereof within which to complete such examination and investigation. Third. The party of the first part, contemporaneously with the execution of this agreement, having executed and delivered to the party of the second part a mortgage upon certain real estate owned by him to secure the payment of whatever sum of money may be found to be due from said party of the first part to the said institution, as aforesaid, with the lawful interest thereon, and the faithful performance of the covenants and conditions herein contained: Now, therefore, in the event that he shall fail to pay such indebtedness, with the interest thereon as aforesaid, the party of the second part may avail himself at once of the said mortgage for the purpose of realizing for the said institution the amount of such indebtedness, with interest and costs and expenses. If, however, upon the expiration of said period of twelve months above provided, no indebtedness from the party of the first part to said savings institution shall be found to exist, then the party of the second part shall cancel the said mortgage of record. Fourth. In the event of the absence of the party of the first part from the city of New York, or the inability of the party of the second part to find the party of the first part, at the time when such indebtedness is determined, a personal demand upon the party of the first part shall be and is waived, and the party of the second part may proceed as if such personal demand were duly made. Fifth. This agreement shall bind the party of the first part, his heirs, executors, administrators, and

assigns, and run to the party of the second part and his successor and successors in representation and to said institution. In witness whereof the party of the first part has hereunto set his hand and seal this 4th day of May, 1893.

"[Signed]                                                    W. H. Buxton."

The mortgage in question recites the agreement, and it is conceded that the rights of Bainbridge Colby in said agreement and mortgage were subsequently assigned to G. Byron Lattimer, the secretary of the plaintiff in this action, who now holds said agreement and mortgage for the benefit of said plaintiff. The plaintiff the Irving Savings Institution was organized as a savings bank in the year 1851, and the defendant Buxton entered its employ as a clerk in or about the year 1863, and continued in its employ to May, 1893. From the year 1890 to May, 1893, he was the secretary of the institution. In 1873 one Tompkins entered into the employ of said institution, and continued in its employ to May, 1893. There was also in the employ of the plaintiff during part of the time Buxton and Tompkins were in the employ of the institution one C. D. Heaton, who in May, 1893, became its president, and a son of C. D. Heaton, who up to and for some time prior to May, 1893, was a clerk in the employ of said institution. It was proved on the trial of the cause that in the latter part of April or early in May, 1893, the bank examiners of the state of New York commenced an examination into the condition of said institution, and as a result of such examination it was discovered that there was a deficiency in its funds of $70,000, or thereabouts. Of this amount over $60,000 had been discovered on the 4th of May, 1893, of which last-mentioned amount $25,000 had been traced directly to the defendant Buxton. On or about the 4th of May, 1893, Buxton was informed of the discovery of this deficiency by the chief bank examiner, and he admitted the existence of a defalcation, but disputed the amount thereof, claiming that it did not exceed $23,000, and that he had kept track of it himself. He, however, took steps to cover the amount of so much of the deficiency traced to him, and in the forenoon of that day placed in the hands of Mr. Heaton, the president of the institution, $25,000 in cash. At this time the examination of the condition of the bank was only partial, and had not been fully completed. On the same day the treasurer of the institution was informed of the discoveries made by the bank examiner, and he thereupon employed counsel to arrange for a meeting of the officers of the institution for that afternoon, to determine upon the steps necessary to be taken in respect to such defalcation. At the meeting which took place in the afternoon of May the 4th, the defendant Buxton was present, and, being taxed with his defalcation, admitted that he was overdrawn, and claimed to have made the overdraft good by the payment to the president of the institution of the sum of $25,000. He was then informed that the deficiency, so far as it had then been discovered, was over $60,000, and he was urged by counsel acting for the institution to take immediate steps to make it all good. He claimed, however, that all over and above the amount paid by him to the president would be found to be errors of bookkeeping, and expressed his willingness to give security for all that he

was responsible for, directly or indirectly. He was urged to deposit a sufficient amount in cash to cover the deficiency which up to that time had been discovered, but stated that he was unable to get the money to do so; and it was finally arranged that he should give a mortgage for the purpose of securing the whole deficiency for which he was directly or indirectly liable. The meeting was then adjourned to a later hour in the afternoon of the same day to the office of the counsel for the institution, where, after discussion, the agreement and mortgage in question were prepared. The agreement, at Buxton's solicitation, was phrased in such language so as to give no indication of the charges which were made against him, and both were executed and delivered to one Colby, as the representative of the institution. The investigation into the condition of the institution was then proceeded with under the terms of the agreement, and it was finally discovered that it had been systematically robbed by its officers and employés for a period of nearly 20 years. All but about $14,000 of the total deficiency was traced to the persons who defrauded the institution. The president was found to be responsible for about $8,000, his son for about $2,000, and Tompkins for about $25,000, and the defendant Buxton $26,382. The investigation and examination disclosed that the defendants Buxton, Tompkins, and Heaton, the president's son, were in the habit of removing from the cash drawer of the bank such sums of money as they required from time to time, entering the amounts taken by them respectively on a slip, which slip was placed in the cash drawer, and was counted as actual cash in the possession of the bank at the close of its daily business. Those slips became so numerous that each person taking the money of the bank charged the amount so taken by him to one or more of the accounts of depositors with the bank, which accounts each kept for that purpose, and of which the evidence clearly establishes that each had almost exclusive control. The evidence clearly established that Buxton, Tompkins, and the two Heatons, in the taking and subsequent appropriation by each of them of the moneys of the bank, acted in concert, each aiding, assisting, and abetting the others in the felonious abstraction of the funds of the bank; and for the purpose of preventing the discovery by the trustees of their felonious acts on the occasion of their (the trustees) making the examination of the condition of the bank, which the by-laws and rules required, the defendant Buxton would borrow a sufficient amount of money from outside parties, equal to the amount which had been abstracted by himself and his confederates, deposit the same with the bank, and upon the completion of the examination by the trustees remove the money so deposited, and replace in the drawer of the bank the slips, tickets, or memoranda heretofore mentioned in lieu thereof. The evidence also establishes conclusively that false statements, purporting to be true and accurate semiannual statements of the condition of the bank, were mainly prepared by Buxton, sworn to by him and Heaton before Tompkins, as notary, and subsequently presented to the bank department, by which false statements it was intended to cover up the fraudulent misappropriation of the funds of the bank, and to deceive the bank department as to its true condition. In

the latter part of April or early in May, 1893, the bank was examined, as above stated, by the officers of the bank department, and it appears that a more thorough system of examination was then adopted by said department than that which had heretofore obtained. The result of the examination showed that the deficiency caused by the larceny of the funds of the bank amounted to near $70,000.

The evidence clearly established the fact that the defendant Buxton was the principal person engaged in the conspiracy to defraud the bank, and profited to a larger extent than the others in the amount feloniously abstracted therefrom. Tompkins seems to have profited in an amount somewhat less than that taken by Buxton, and the Heatons, father and son, in yet smaller amounts than either. There can be no doubt whatever on the evidence, which I have carefully considered, that Tompkins and the Heatons, in what they did in the larceny of the funds of the bank, did so with the full knowledge and assent of Buxton. The defense interposed by Buxton is: First, a denial on information and belief of his indebtedness to the plaintiff in any sum whatever; secondly, a denial that the mortgaged premises are subject to the lien of the mortgage in question. The principal questions litigated on the trial were: First, the extent of the liability of the defendant Buxton under the agreement which the mortgage was intended to secure; secondly, the total amount of the deficiency.

Upon the first question it was claimed that the defendant could not be held responsible for any losses which the bank had sustained other than those which were caused by his individual acts. In other words, that he could not be held legally liable for the felonious acts of Tompkins and the Messrs. Heaton, and that by the terms of the agreement in question and the intent of the respective parties thereto his liability thereunder only extended to the amount abstracted by him individually from the bank. Evidence was introduced on the part of the plaintiff and the defendant in respect to the circumstances existing at and prior to the time of the execution of the agreement in question. The introduction of this evidence was provided for in the agreement itself, which, after reciting that it was claimed by the institution, or some of the officers thereof, that Buxton was indebted to it in a large amount of money, which indebtedness, if any, was created under circumstances not therein set forth, provided that such circumstances might be shown if the agreement was ever sued upon in a court of law or equity; and, further, that the amount of such indebtedness was to be ascertained by an examination of the condition of the bank, which examination was to be completed within 12 months after the execution of the agreement. The evidence bearing upon this part of the case convinces me that at the time of the first meeting of the parties, on the 4th of May, 1893, above referred to, it was clearly understood by both parties that Buxton should be held liable for all losses sustained by the bank which were caused directly or indirectly by means of his and his associates' felonious acts which caused said loss; and again on the same day, at the second meeting of the parties, at the office of the counsel for the bank, while

the papers were in process of preparation, and when the matter was discussed, it was clearly proved that it was Buxton's intention not only to secure the bank against the loss sustained by it by reason of his individual acts, but also by reason of the felonious acts of his associates. This was testified to positively by reputable witnesses produced by the plaintiff, and was denied by the defendant Buxton. He testified that on neither occasion were the words "directly" or "indirectly" used, and that it was not understood that he should be held liable for any amount exceeding that taken by himself individually. He produced two witnesses who were present, or claimed to have been present, during both interviews, and all they testified to, in respect to the use of the words "directly" or "indirectly," is that they had no recollection of such words being used at either meeting. Buxton's veracity has been seriously impaired by his own and other testimony in the case, showing that he willfully swore to false statements in respect to the condition of the bank, knowing them to be false at the time he so swore to them. The testimony given in support of the claim of the bank that such words were used, and that it was the intention of Buxton not only to make himself liable for such sums as were traced to him individually, but for the entire defalcation, whatever it should amount to when discovered, was established by witnesses of unimpeachable character, and this contention seems to be clearly sustained, not only by the testimony of the plaintiffs' witnesses, but also by the terms of the agreement itself, as well as by the surrounding circumstances attending its execution.

As to the second point litigated (the amount of the defalcation), I have examined with great care the evidence bearing upon the question of the amount of the defalcation, and, eliminating such items as have not been proved beyond all question, and crediting defendant with the amount paid by him on the 4th of May, 1893, on the discovery of the defalcation, there appears to be due to the plaintiff, under the agreement and mortgage in question, the sum of $36,030.94. This sum includes interest to the ———— day of ————, to which day said interest was calculated and proved.

Having concluded upon the evidence that by the agreement entered into on the 4th day of May, 1893, it was clearly the intention of both parties that Buxton's liability should extend to whatever amount should, under the terms of the agreement, be ascertained to have been felioniously taken from the bank by himself or others aiding in its felonious abstraction, it is only necessary to determine whether the defendant, under the proofs in this case, is legally liable for the whole amount of the deficiency. An examination of the authorities bearing upon that question leads me to the conclusion that he is. The position occupied by the defendant Buxton in the bank was one of extreme trust and confidence, on assuming which he bound himself by oath to subserve the best interests of the institution, and guard its funds as a sacred trust. He exercised a supervision over the other employés of the bank, and whatever was done by them towards creating the defalcation was done with his assent and knowledge; and no effort was made by him, although it was within his power to do so, to protect the bank and its funds, or even

to notify the trustees of the felonious acts of his associates. In Bank v. Ten Eyck, 48 N. Y. 307, the court said:

"The defendant, as cashier, was a financial agent of the plaintiff, intrusted to some extent with the management of its affairs. As such agent he was bound to exercise reasonable skill and ordinary care and diligence in the discharge of his duties. If he failed in such skill, or omitted such care and diligence, and in consequence thereof the plaintiff suffered damage, he is liable to respond; and much more is he liable to respond if he caused any damage to the plaintiff by any illegal, fraudulent, or tortious act."

This rule grows out of the duty which every agent owes his principal to exercise ordinary diligence in the protection of the interests of his principal,—such diligence as a prudent man, under the circumstances, would display about his own affairs,—and is supported by many authorities, among which may be cited Hun v. Cary, 82 N. Y. 65; Scott v. Depeyster, 1 Edw. Ch. 513; Austin v. Daniels, 4 Denio, 299; Hobart v. Dovell, 38 N. J. Eq. 553; Bank v. Elwood, 21 N. Y. 88. In the case of Hobart v. Dovell, above cited, the action was to compel the receiver of a bank to account for the rents and profits of certain property which had been conveyed to the bank. It was admitted that the conveyances were for security only, and it was proved that they had been executed under the following circumstances: The son of the defendant had been a teller of a bank. He had permitted the cashier to embezzle moneys of the bank, and made, under his directions, certain entries, which covered up the shortage. On the discovery of the shortage, the defendant having been informed of the fact, and of her son's claim that he had taken none of the money, conveyed the property as security for any deficiency that might be against him. The contention was that this covered only such sums as he might personally have taken, and, if he had taken nothing, then she was entitled to reconveyance, and an accounting of the rents and profits. The court held as follows:

"Our conclusion is that it was designed to indemnify the bank, not only for funds abstracted by Dovell himself, but also for all of the deficiency for which he was civilly responsible. * * * The testimony hitherto produced indicates that the deficiency arose in whole, or in great part, from the embezzlement by the cashier of moneys in the hands of Dovell, the teller. Some of the cashier's transactions were of such a nature that it is difficult to believe that the teller was not apprised of their dishonest or unauthorized character; yet, nevertheless, he lent himself to their furtherance by actually delivering to the cashier the money which he asked for, and concealing the facts beneath false statements in his accounts. For knowingly assisting in such an abstraction the teller would be as responsible to the bank as if he had spent the money himself. He was an officer of the bank, having certain prescribed duties, for the faithful performance of which he was bound directly to the corporation. No orders of the cashier could exculpate him in the breach of those obligations. Within the scope of the cashier's authority, and so long as he was apparently acting on behalf of the corporation, the cashier's directions might control the teller, and the latter might not be required to look beneath the surface of his superior's acts. But when he was led to believe that the cashier was violating his own duty to the bank, and was taking the bank's funds for his own ends, irregularly, and without authority from the directors, the teller had no more right to aid or connive at such misappropriation than if it were being perpetrated by a stranger. The same principle would hold if the embezzler were a director or the president. Such misconduct on the part of Dovell we think the evidence tends to establish in more than one instance, and so far as it helped to effect a loss to the bank he is answerable."

In respect to the point which has been urged on behalf of the defendant as to the construction to be given to the agreement in question, and to the use of the words "indebted" and "indebtedness" as limiting the defendant's liability to such sums as he himself feloniously abstracted from the bank, it is sufficient to say, in addition to what has been said upon the subject, that the testimony as to the surrounding circumstances and conversations which led up to the execution of the agreement was competent to explain the sense in which the term "indebtedness" was used.    Blossom v. Griffin, 13 N. Y. 569; Bank v. Myles, 73 N. Y. 335.    In this latter case evidence of surrounding circumstances was admitted, and in the case of French v. Carhart, 1 N. Y. 96, the court say:

"Too much regard is not to be had to the proper and exact signification of words and sentences, so as to prevent the simple intention of the parties from taking effect; and whenever the language used is susceptible of more than one interpretation the court will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties, and of the subject-matter of the instrument. To this extent, at least, the well-settled rule is that extraneous evidence is admissible to aid in the construction of written contracts."

But, as already shown, the agreement, by its terms, provides for the admission of testimony of this character.    Other authorities might be cited bearing upon this subject, but it is not deemed necessary to refer to them.    Upon the whole case I am of the opinion that the plaintiffs are entitled to the judgment prayed for, with costs.

Judgment for plaintiffs, with costs.