JOHN A. SARGENT, *as Administrator of the estate of Martin L. Sargent, deceased*, v. THE KANSAS MIDLAND RAIL-ROAD COMPANY *et al.*

1. CONTRACT—*Assignment of Benefits.* Where a contractor with a railroad company is to receive capital stock of the company for labor, services and materials furnished, and the failure to perform all of the conditions of the contract by the contractor renders it null and void, such contractor cannot sell or transfer any part of such stock so as to bind the company before he has complied with the terms and conditions of the contract on his part.

2. ———— *Rights of Assignee.* Where a contractor under such a contract becomes financially embarrassed, and is unable to complete his contract, and subsequently enters into an agreement with a construction company to transfer to such company all of his contracts upon condition that the company shall receive all of the stock, moneys and property agreed to be paid to the contractor, and such construction company carries out and completes such contract, it has a prior right to all of such stock, moneys and property as against the contractor, or any persons to whom the contractor has attempted to transfer any stock, when it was not earned or paid for.

3. CORPORATION—*Contracts of Directors.* The relation between the directors of a corporation and its stockholders is that of trustee and *cestui que trust.* The directors are persons selected to manage the business of the company for the benefit of the shareholders. It is an office of trust, which, if they undertake, it is their duty to perform fully and entirely. No director of a railroad company or any other corporation can use his official position to secure a personal advantage to himself. A contract made by a director under such circumstances

is either void or inures to the benefit of the corporation of which he is an officer.

4. CONTRACT, *Not Enforced in Equity.* If a director of a railroad company induces parties to deliver him an order for stock or other propetry, upon the ground that he has power or influence to control the action of his company in establishing or promoting new lines or branches, and such director has no such power or influence, the order is obtained by deception or fraud, and the contract therefor cannot be enforced in equity.

### *Error from Douglas District Court.*

ACTION by *Martin L. Sargent* against the *Kansas Midland Railroad Company* and others to enforce a claim for certain stock. On a judgment for defendants, plaintiff brought error. He subsequently died, and his administrator, *John A. Sargent,* was substituted as plaintiff. The facts fully appear in the opinion herein, filed May 7, 1892.

*L. B. Wheat, Samuel A. Riggs, Wm. P. Douthitt,* and *James W. Green,* for plaintiff in error.

*S. O. Thacher,* and *A. A. Hurd,* for defendants in error; *Geo. R. Peck,* of counsel.

The opinion of the court was delivered by

HORTON, C. J.: This action was brought by Martin L. Sargent, who claimed he was an equitable stockholder in the Kansas Midland Railroad Company, subsequently consolidated with the Lawrence & Topeka Railway Company, and thereafter known as the Kansas City, Topeka & Western Railroad Company, upon the following instrument, acceptance, and assignment:

"KANSAS MIDLAND RAILROAD, CONSTRUCTION DEPARTMENT.   GEORGE D. CHAPMAN, CONTRACTOR AND GENERAL MANAGER.

"TOPEKA, KAS., July 1, 1874.

*"Kansas Midland Railroad Company, H. Bartling, President:*

"Please deliver to T. J. Peter, trustee, 1,000 shares of the full-paid stock of the Kansas Midland Railroad Company, and oblige,          Yours, etc.,   GEORGE D. CHAPMAN."

"Accepted: H. Bartling, president.   7-1-'74."

43 — 48 KAS.

"July 2, 1877, for value received, I hereby assign to Martin L. Sargent the within certificate for 1,000 shares of the Kansas Midland Railroad Company's capital stock.

T. J. PETER, <em>Trustee."</em>

Trial before the court without a jury, at the November term for 1886. After the evidence was submitted and the arguments of counsel, the court took the case under advisement until the May term of the court for 1888; and on the 23d day of July, 1888, stated in writing its conclusions of fact and of law. After the case was brought to this court, Martin L. Sargent died, and on February 2, 1892, the case was revived in the name of John A. Sargent, as administrator of the estate of Martin L. Sargent, deceased. It appears that on the 2d day of December, 1868, the Lawrence & Topeka Railway Company was organized under the laws of the state, with a capital stock of $750,000, divided into 7,500 shares of $100 each, for the purpose of constructing and operating a railway from Topeka to Lawrence. On the 29th day of May, 1873, the Kansas Midland Railroad Company was organized to construct and operate a railroad from Kansas City, Mo., through the counties of Wyandotte, Johnson, Douglas, and Shawnee, to Topeka, in this state. On October 31, 1874, certain creditors of the Lawrence & Topeka Railway Company and the Kansas Midland Railroad Company organized under the laws of the state "The Consolidated Railroad Construction Company," for the purpose of paying the debts of the Lawrence & Topeka and Midland companies, and of constructing and completing a railroad from DeSoto, in this state, to Kansas City, Mo. On July 13, 1875, the Kansas Midland Railroad Company and the Lawrence & Topeka Railway Company were consolidated as the Kansas City, Topeka & Western Railroad Company.

The stock which Martin L. Sargent claimed was a part of the stock issued to the construction company, which company afterward transferred it to F. H. Peabody, trustee for certain parties who had large interests in the Atchison, Topeka & Santa Fé Railroad Company. After the Kansas Midland

and the Lawrence & Topeka companies were consolidated as the Kansas City, Topeka & Western Railroad Company, this company issued its stock to an amount equal to the aggregated stock of its two constituent companies. Afterward, this company purchased all the stock of the construction company. In 1879, the shares of stock of the Kansas City, Topeka & Western Railroad Company were exchanged for those of the Atchison, Topeka & Santa Fé Railroad Company, share for share. Prior to the 14th day of July, 1873, the Lawrence & Topeka Railway Company entered into a contract with Blush, Armil & Co. for the construction of its proposed railway from Topeka to Lawrence. On the 14th day of July, 1873, the Lawrence & Topeka Railway Company executed and delivered to the Kansas Midland Railroad Company a deed to its property, rights, and privileges. On the same day the Lawrence & Topeka Railway Company, the Kansas Midland Railroad Company and Blush, Armil & Co. mutually made, executed and delivered to each other their certain agreement in writing of that date, whereby the Kansas Midland Railroad Company was to construct the railroad from Topeka to Lawrence, before that time contracted for by Blush, Armil & Co. The Kansas Midland Railroad Company agreed to pay to the Lawrence & Topeka Railway Company $35,-041.72, and to Blush, Armil & Co. the unpaid balance of the claims and liens of the latter for work done and materials furnished for the Lawrence & Topeka Railway Company, amounting to $55,000, with interest at 12 per cent. from July 1, 1873; also, to pay and discharge the certain other claims against the Lawrence & Topeka Railway Company, its officers and directors, amounting to $15,027.44, and to pay for right-of-way, expenses, etc. After the execution and delivery of the deed and written agreement of July 14, 1873, the Lawrence & Topeka Railway Company had no property except the payments reserved to it.

On the 14th day of July, 1873, the Kansas Midland Railroad Company entered into an agreement in writing with Geo. D. Chapman to complete the railway between the cities

of Lawrence and Topeka, so partially constructed by Blush, Armil & Co., for the Lawrence & Topeka Railway Company, but conveyed to the Kansas Midland Railroad Company. Under this contract, Chapman was to fully complete and put in running order a railroad between Topeka and Lawrence, and, by a subsequent modification of the contract, the cars were to run regularly thereon by the 1st day of June, 1874; and when Chapman had fully performed all of the conditions of the contract upon his part, which said contract also included certain matters and things embraced in the tripartite contract of the same date between the Lawrence & Topeka Railway Company, the Kansas Midland Railroad Company, and Blush, Armil & Co., he was to receive in part pay 9,730 shares of the capital stock of the Kansas Midland Railroad Company. On the 29th day of May, 1874, Chapman had the railroad of the Kansas Midland Company constructed from the city of Topeka to a point within the city of Lawrence, and the cars running thereon regularly from June 1. At a point about 500 feet east of the west limits of Lawrence, the building of the road was delayed by an injunction obtained by a land-owner, so that the road was not completed to the depot of the Pleasant Hill road until June 13, 1874, a distance of about one mile from the point above named. The railroad had no depot of its own at Lawrence or Topeka, nor at any other point on its line. It used, however, the Atchison, Topeka & Santa Fé depot at Topeka, and the depot of the Pleasant Hill road at Lawrence, after June 13, under lease with the respective companies owning them. The length of the line between the depots named was $26\frac{6}{10}$ miles. Chapman was a member of the executive committee of the Kansas Midland Railroad Company from the 29th day of May, 1874, until the 7th of November, 1874; and, soon after the cars were running on the road from Topeka to Lawrence, he was made the general manager of the Kansas Midland Railroad Company. On October, 1874, Chapman was heavily indebted, not only on the obligations assumed in the agreement of July 14, 1873, but to various persons and cor-

porations. He was financially embarrassed and unable to complete his contract.

It appears that "trustee" to Peter's name in the order sued on was written by him for the reason that Martin L. Sargent, then the general freight agent of the Atchison, Topeka & Santa Fé Railroad Company, was jointly interested with him. When this action was brought, Martin L. Sargent owned three-fifths of the alleged cause of action, and Peter two-fifths. The trial court specially found that Chapman failed to carry out or perform the conditions of his contract of July 14, 1873, with the Kansas Midland Railroad Company. Upon all of the findings of fact, the trial court made the following conclusions of law:

"That Chapman was not, on July 1, 1874, or afterward, the owner of 9,730 shares of the full-paid stock of the Kansas Midland Railroad Company, a part whereof were included in the order sued on; that Mr. Bartling, as president of the company, had no authority to accept the order, and his indorsement thereon did not bind the company; that neither Martin L. Sargent nor his assignee, T. J. Peter, ever became the equitable owner of the 1,000 shares so attempted to be transferred."

Subsequently judgment was rendered for the defendants for costs.

We think the conclusions of law of the trial court must be sustained. Chapman was not entitled to any stock of the Kansas Midland Company, excepting under the provisions of the contracts to which he was a party. The contract of the 14th of July, 1873, provided that—

"In case of a failure on the part of Chapman to do and perform the several matters and things, or any of them, by him agreed to be done in this agreement, and at the time or times hereinafter specified, then, and in that case, this agreement shall be and become null and void and of no effect, and the said parties shall be and remain as to all matters herein mentioned the same as if this agreement had never been made, and the said party of the second part hereby releases the said party of the first part from any claims for damages by reason of the same."

This contract was further hedged about by the tripartite contract of the same date, which contained this provision:

"The Kansas Midland Railroad Company further agrees, that no more than the sum of $5,000 of its capital stock, and no more than the sum of $450,000 of the first-mortgage bonds of said company shall be issued by said company until all and singular the obligations of this agreement, on the part of said parties of the second part, are fully fulfilled, carried out, and discharged."

The contract of July 14, 1873, was attempted to be modified on March 6, 1874, but neither the Lawrence & Topeka Railway Company, nor Blush, Armil & Co., parties to the tripartite contract, signed or agreed to this modification. That modification contained this provision:

"In case Chapman shall fail to carry out and complete his contract, according to the terms and effects thereof, in all respects and as herein modified, or if the said Chapman shall fail to have said . railroad completed and the cars running thereon on or before the 1st day of June, 1874, then and in that case this agreement shall be null and void and of no effect."

It is clear that Chapman did not perform all of the obligations he assumed under the contract of July 14, 1874, even as modified. He neither paid the debts of the Lawrence & Topeka Company, nor Blush, Armil & Co., nor for the right-of-way. If Chapman had no legal or equitable right to any of the stock of the Kansas Midland Company on July 1, 1874, he could not transfer to Peter, or any one else, any stock in that company. His attempt so to do would not avail anything. At most, the action of Bartling, the president of the Kansas Midland Company, in accepting or indorsing the order of Chapman, would be only notice to the company of the claim of Peter, but would not be conclusive or binding. Under the modifications of the contract of July 14, 1873, Chapman might perhaps have been entitled to the stock in the Midland company, but those modifications were not signed by all the parties to the tripartite contract, and as that contract was a part of the original contract, any modifi-

cation of the original contract, changing in any way the terms of the original or tripartite contract, would not, in the absence of the signatures of all the parties, be valid. We specially refer to the clause of the tripartite contract limiting the issuing of stock to the amount of $5,000 only, because at the date of the order sued on the Kansas Midland Company had issued 1,600 shares of its stock to the city of Topeka, 61 shares to sundry individuals, and 2,400 shares in trust as otherwise provided; therefore, at the date of the order, the Kansas Midland Company had issued more stock than the tripartite contract permitted. This clause referred to is found in the contract attached to and made a part of the amended and supplemental petition filed February 12, 1883. The contract as therein recited is admitted by the answer. The provisions of the contract therefore are not only admitted, but cannot be contradicted. The trial court in its findings of fact refers to this contract and makes it a part thereof.

The proceedings to reverse the judgment of the trial court come here by a case-made. Not only are we bound by the allegations of the petition, which are admitted by the answer, but even if these allegations are incorrectly copied the case-made cannot now be amended or changed. We must assume that the pleadings as preserved in the case-made are correctly recited. (*Dowell v. Williams*, 33 Kas. 319; *Snavely v. Buggy Co.*, 36 id. 106; *Lewis v. Linscott*, 37 id. 379; *Graham v. Shaw*, 38 id. 734; *Hill v. National Bank*, 42 id. 364.)

We make these comments concerning the $5,000 limitation, because in the briefs and in some portions of the evidence offered $500,000 of capital stock is mentioned in the place of $5,000. But in view of the findings of the trial court, even if $500,000 of capital stock were permitted to be issued, if all the contracts had been complied with by Chapman, we do not think the judgment can be reversed. The reasons for this are manifold; sufficient are stated herein; others might be mentioned. After Chapman became financially embarrassed and failed to perform the contract of July 14, 1873, the Consolidated Railroad Construction Company was organized (as be-

fore stated), in October, 1874, by the creditors of the Kansas Midland and the Lawrence & Topeka companies, to pay the debts of those companies and construct the railroad which Chapman had commenced from De Soto to Kansas City. This company, on November 7, 1874, entered into a written contract with the Kansas Midland Railroad Company to carry out the purposes of its organization. If it performed the conditions of that contract it was to have "all of the stock of the Kansas Midland Company, all the bonds issued or to be issued by the company, and all the property and assets of the company in its possession or thereafter to be possessed by it." Afterward, the stockholders of the Kansas Midland Railroad Company adopted the following resolution : " That all the capital stock of the company, excepting that issued to the city of Topeka, in payment of its subscription, and one share each issued to the directors, be, and the same is hereby, turned over to the trustees of the Consolidated Railroad Construction Company, to be disposed of according to the terms of the agreement between the Kansas Midland Railroad Company and said company." Before this time, at a special meeting of the board of directors of the Kansas Midland Company, it was unanimously resolved that the contract of July 14, 1873, with Chapman, to construct the Kansas Midland railroad, be annulled, on the ground that he had failed to carry out the stipulations of the same. Notice of this resolution was directed to be served on Chapman. It is not necessary to decide whether this special meeting was properly called. We only refer to it to show the claim of the Midland company that the contract of Chapman had not been complied with.

It is urged, however, that, as the Consolidated Railroad Construction Company, on the 2d of January, 1875, entered into a contract with Chapman for an assignment and transfer of his contracts with the Lawrence & Topeka Railway Company and the Kansas Midland Railroad Company, for which $5,000 was paid, and also agreed to perform the conditions therein mentioned, and as the construction company completed the railroad commenced by Chapman, and paid or discharged

all obligations assumed by him in the contracts, there was no forfeiture of the Chapman contracts, and therefore that the stock sued for was earned, if not by Chapman, by his assign or successor. But the contract between Chapman and the construction company contained this clause:

"And the said party of the first part (Geo. D. Chapman) covenants and agrees to and with the said party of the second part that he has not, either as contractor or general manager of the Kansas Midland Railroad Company, contracted or incurred any debts or liabilities in the carrying out of his said contract herein mentioned, or in the construction or management of the said railroad, and for which the said railroad company is or can be held liable, other and except such as are now noted in and standing upon the books of the Kansas Midland Railroad Company."

The books of the Kansas Midland Company did not show the order to Peter, or that Chapman, or Peter, was entitled to 1,000 shares of stock. At the date of the order sued on, the Kansas Midland Railroad Company had issued 4,061 of its shares.

While three or four of the stockholders of the construction company were informed of the existence of the order of Chapman to Peter of July 1, 1874, they must also have known that at the date of the order Chapman had earned no stock and was not entitled to any stock. No notice of the order was given to the corporation, or to the persons named as officers of the corporation. When the construction company entered into the contract of January 2, 1875, Chapman was not entitled to 1. Contract—assignment of benefits. the stock, nor was Peter entitled to the stock, because of the non-performance of the conditions of the contracts of Chapman. On the same day that the construction company obtained an assignment and transfer from Chapman of all contracts held by him with the Lawrence & Topeka and Kansas Midland companies, it also obtained from H. Bartling, the president of the Kansas Midland Company, by assignment in writing, his right, title and interest in the various contracts between Chapman and the railroad companies. It is possible that the construction company obtained

the assignments and transfer of the contracts from Chapman and Bartling to purchase peace, or to relieve itself from all complications in performing its contract of November 7, 1874, with the Kansas Midland Railroad Company. It is, under the facts disclosed, difficult to decide.

Chapman expended $8,000 a mile upon the road from Topeka to Lawrence. Its cost to him on May 29, 1874, when he quit work, was about $212,800. He received from Topeka bonds at 80 cents on the dollar, $128,000; from $450,-000 mortgage bonds, at 70 cents (price fixed in contract of February 28, 1874), $204,800; total, $332,800. In addition he was to have 9,730 shares of the capital stock of the Midland company, although the city of Topeka was thereby to be deprived of its 1,600 shares of stock, paid for with $160,000 of city bonds. The Atchison company expended on the line from Topeka to Kansas City about $15,000 to $20,000 per mile in putting it into suitable repair and condition for business. This shows better than anything else the manner the road was constructed by Chapman from Topeka to Lawrence. In view of the conduct of Bartling and Chapman and the sale of Bartling's interest in the Chapman contracts, it is very probable that Bartling and Chapman had a secret arrangement or understanding, whereby Bartling, the president of the Midland company, had some interest in these contracts; therefore, very much might be said, if it were necessary, in condemnation of the contracts which Chapman had obtained. (*Jackson v. Traer*, 64 Iowa, 469; 52 Am. Rep. 449; Green's Brice, Ultra Vires, 143; *Port v. Russell*, 36 Ind. 64; Mor. Corp., 2d ed., §§ 517, 520; *Wardell v. Railroad Co.*, 103 U. S. 657; *Railroad Co. v. Kelly*, 77 Ill. 436; *Ryan v. Railroad Co.*, 21 Kas. 365; *Savings Bank v. Wulfekuhler*, 19 id. 60.)

It does not benefit the plaintiff to urge, in defense of the Chapman contracts and the conduct of Bartling, that the contracts of the construction company with the railroad companies are also subject to censure. This is an action asking for the specific performance of a contract. The appeal for relief is to the equitable jurisdiction of the court, and proof that the de-

fendants or their grantors have unclean hands will not cleanse those of a plaintiff, so as to compel the enforcement of a claim based upon transactions which the court cannot approve. If all the parties to a transaction are unclean, a court of equity will give relief to none. But it is immaterial, under all the findings, whether the construction company completed its railroad and paid the obligations which Chapman had assumed on account of its contract with the Kansas Midland Company of November 7, 1874, or the contract with Chapman of January 2, 1875. The rule would be otherwise if, at the date of the order from Chapman to Peter, Chapman was then entitled to the stock. The construction company paid the debts of the Lawrence & Topeka and the Kansas Midland companies, and under both of the contracts with the Kansas Midland Company and Chapman it was entitled to the stock not actually issued. Chapman did not earn the stock according to his contracts. The construction company obtained the stock by doing and performing certain things, and, before it agreed to do and perform these things, Chapman expressly stipulated that he had not contracted or incurred any debts or liabilities excepting those found upon the books of the Midland company. What was subsequently earned by the construction company, whether it was stock, money, or property, ought not, in fairness, to go to the benefit of Chapman or Bartling, or Peter or his assignee. Even if plaintiff below may make an equitable claim to any stock on account of the completion of the contracts of Chapman by the construction company, a formidable obstacle, however, forbids its enforcement, in an action of this kind.

2. Rights of assignee.

Upon the trial, L. K. Thacher, of Kansas City, Mo., who was president of both of the railroad companies organized for the purpose of constructing a railroad from Kansas City, Mo., to De Soto, in this state, and who was also one of the trustees having charge of $100,000 of bonds of Kaw township, in Jackson county, Mo., voted to secure the Atchison Railroad Company, testified:

"Kaw township, in Jackson county, Mo., proposed to vote

bonds for the purpose of building a railroad to make a connection with the Atchison, Topeka & Santa Fé railroad, and according to our laws the bonds could not be voted to a corporation outside of the state; hence it became necessary to organize a company to build the line from Kansas City to the state line; and the bonds were voted to that corporation; and then to procure the line to De Soto from the state line the other corporation was organized. The vote, I think, was in 1872 or 1873.

"Q. What was the amount voted? A. $100,000. . . . All my conversation and intercourse with Mr. Peter was with him as representing the Atchison, Topeka & Santa Fé Railroad Company. It was not my first acquaintance with him. He knew, of course, as I had frequently stated to him, that our people would not be satisfied with any arrangement that did n't result in bringing the Atchison into Kansas City; and we did not dare to deliver the bonds to any company that did n't secure us that connection with the Atchison. We were afraid that, if we gave the contract to the Carbondale people, we would be sold out to the Union Pacific, or the Kansas Pacific. I naturally felt somewhat anxious about the matter, because I knew that if we failed to get the connection with the Atchison, and fell into the hands of the Kansas Pacific, our people would hold us responsible for it. That was why we sought Mr. Peter and the other gentlemen of the Atchison company.

"Q. Did anybody suggest to you to go and see him? A. If anybody did it was Mr. Chapman.

"Q. Would you have sought Mr. Peter and had interviews with him upon the subject if you had not understood him to be an officer and representative of the Atchison, Topeka & Santa Fé Railroad Company? A. I should not.

"Q. Did you know at that time that Mr. Peter was an officer of the Atchison, Topeka & Santa Fé Company? A. I think he was an officer."

George D. Chapman, among other things, testified that—

"After the completion of the Kansas Midland railroad from Topeka to Lawrence, I found that the Atchison road was not inclined to coöperate in any way with the road, and as I had been led to suppose it would, from statements made to me by C. K. Holliday, who was a director in the Atchison, as well as a director in the Kansas Midland road. According to my best recollection, I was then the general manager of the Kan-

sas Midland Company and T. J. Peter was a director in the Atchison company. I also understood that Peter was the confidential agent of the Atchison company in the purchase of mineral lands; in the investigation of the advisability of building branch lines; in the acquirement of rights-of-way for any extensions anticipated; and while I had understood he had resigned as general manager of construction, I had been led to believe, by conversation with D. L. Lakin and C. K. Holliday, that he was really the confidential agent for the Atchison company. He held a very large stock interest in the company and a large landed interest along its line. . . . I found upon investigation that there had been voted by Kaw township, in Missouri, $100,000 of bonds in aid of the construction of a line of road from De Soto to Kansas City, and that these bonds had been placed in the hands of Major Thacher and Mr. Hunt as trustees. I opened negotiations with these gentlemen, endeavoring to get them to agree that they would turn over these bonds to me on the completion of such a road. They refused, on the ground that they were holding the bonds for the purpose, through the medium thereof, to get the Atchison road to build into Kansas City, and they would not give up such bonds until they made such arrangement. I then went to Mr. Holliday and endeavored to get him to assist me in inducing the gentlemen in Kansas City to turn the bonds over to me, and to go down there and satisfy them that if this road was completed it really meant the building of the Atchison road, and that by aiding in building the road they would acquire what they wanted. Mr. Holliday stated that he had no influence with these gentlemen, and that the best man to bring about such an arrangement was Mr. Peter. I then requested Mr. Peter to go, or requested, I think, Mr. Holliday to use his influence with Mr. Peter to get him to go. Mr. Peter said 'he would go there and explain to them what I was endeavoring to carry out, and give them his views in regard to the ultimate outcome, and the position of the Atchison, Topeka & Santa Fé road in the matter, if I would give him 1,000 shares of stock.' I agreed to this, and told him 'I would give him the stock when I got the bonds.' He wanted some evidence of my being willing to carry out this arrangement, and asked me to give him an order for the stock, which I did. I never got the bonds. In my transfer of my interest to the Consolidated Construction Company, I made no reservation of this order, because its consideration was never

received by me. Mr. Peter, as an officer of the Atchison company, had of course influence with the Kansas City people, and it was because both he and Holliday were such officers that I talked with them."

Upon the foregoing and other evidence, the trial court found that at the time Peter obtained the order sued on he was a stockholder and director of the Atchison Railroad Company, and had so been from 1868, and had been general manager up to April, 1873. At this time the Atchison company had no connection with Kansas City by any railroad of its own, but was seeking such connection, and it was the desire of Chapman to persuade the Atchison company to use the Kansas Midland road in making such connection. Chapman was also building the link in the Kansas City connection between Kansas City and De Soto Junction, on the Pleasant Hill road, and from that junction the Pleasant Hill road extended westwardly to Lawrence. Kaw township, in Jackson county, Missouri, (which included Kansas City,) had voted $100,000 bonds to a local company to secure the Atchison connection at Kansas City, and the parties holding these bonds in trust would not permit them to go in any other direction, nor to any company that did not have the approval of the Atchison company. Chapman was desirous of procuring these bonds, and made several overtures to the Kansas City trustees holding them. Learning, however, that the trustees holding these bonds were willing to accept the statements of Peter as to the intentions and purposes of the Atchison company, and understanding that Peter was the managing agent of that company, and influential in determining its policy, he proposed to Peter to go to Kansas City and procure the trustees to turn over the bonds to the Kansas Midland Company, of which he, Chapman, was the general manager. The trustees also understood that Peter was a director and agent of the Atchison company and authorized to speak for it, and were willing to act upon his representations as to what that company proposed to do in the premises. Thereupon Chapman applied to Peter to assist him in such

negotiations, and to make such representations of the purpose of the Atchison company with respect to a connection with Kansas City as would satisfy the trustees and induce them to turn over the bonds to Chapman. Peter consented to do this, on condition that Chapman would give him 1,000 shares of stock in the Kansas Midland Company, and to this Chapman agreed.

Before proceeding to Kansas City, however, to enter upon the negotiations, Peter applied to Bartling, the president, to know whether he would accept the order and issue the stock, and Bartling promised to issue the stock, "if he, Peter, could do for Chapman what he had promised." Peter then went to Kansas City and made such representations to the trustees holding the bonds as satisfied them that the Atchison company would adopt the Kansas Midland railroad as a part of its line in case it should be completed as contemplated. The trustees understood and believed at the time, and Peter intended that they should understand and believe, that he was speaking as the representative of the Atchison company, and they were thus induced to consent and agree to the contract. The Kaw township bonds had been voted to a local Missouri corporation called the Kansas City, Lawrence & Topeka Railway Company, which was under the control of the same trustees who controlled the bonds, and thereupon the Kansas City, Lawrence & Topeka Railway Company, so induced by Peter, entered into a contract with the Kansas Midland Company to construct the entire line between De Soto Junction and Kansas City, Mo., in consideration of the Kaw township bonds and certain stock of the local company. This contract was dated June 11, 1874, is signed by George D. Chapman, general manager for the Kansas Midland Company, and by the proper officers of the other company. By its terms the road was to be completed October 1, 1874, and the bonds were not to be delivered until the road was so completed, and cars running thereon. Upon the execution and delivery of this contract, Chapman, in consideration of Peter's services in the negotiations as above stated, executed and delivered the

order for 1,000 shares of Kansas Midland stock, and there was no other consideration for this order.

Upon the findings of the court and the evidence referred to, if Peter deceived or misled Chapman or Thacher and Hunt, the trustees in Kansas City, as to his power or influence with the Atchison Railroad Company, then the order sued on was obtained by fraud, and the contract cannot be enforced in equity. If, on the other hand, Peter was using his influence as a director or agent of the Atchison company, he could not speculate upon his fiduciary relations. The relation between the directors of a corporation and its stockholders is that of trustee and *cestui que trust*. The directors are persons selected to manage the business of the company for the benefit of the shareholders. It is an office of trust, which, if they undertake, it is their duty to perform fully and entirely. No director of a railroad company or any other corporation can use his official position to secure a personal advantage to himself. A contract made by a director under such circumstances is either void or inures to the benefit of the corporation of which he is an officer. (19 Eng. L. & Eq. 361–365; same case, 16 Beav. 485–491; *Scott v. Depeyster*, 1 Edw. Ch. 513; *Verplanck v. Insurance Co.*, 1 id. 46; *Railway Co. v. Poor*, 59 Me. 277; *Bestor v. Wathen*, 60 Ill. 138; *Ryan v. Railway Co.*, 21 Kas. 365.)

*4. Contract, not enforced in equity.*

*3. Corporation— contracts of directors.*

The objection to the evidence introduced showing that the order from Chapman to Peter for stock was not for labor or service is not tenable. The petition, as amended, alleged that the consideration of the order sued on was for labor and services. This was denied generally and also specifically. The court, therefore, committed no error in permitting the transactions between Bartling, Peter, and Chapman, concerning the order for the stock, to be fully disclosed to establish that the consideration therefor was not for labor or services, within the terms of the contracts between Chapman and the railroad companies.

The judgment of the district court will be affirmed.

All the Justices concurring.